UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HABIB SADID,<br><br>               Plaintiff,<br><br>   v.<br><br>ARTHUR VAILAS, RICHARD JACOBSEN, GRAHAM GARNER, DAVID BEARD, and JOHN/JANE DOES I through Z, whose true identities are presently unknown,<br><br>               Defendant. | Case No. 4:11-cv-00103-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

In 2008, Dr. Habib Sadid, then a tenured professor at Idaho State University ("ISU"), sued Arthur Vailas, the university's president, and Richard Jacobsen, the dean of the College of Engineering, in Idaho state court for retaliating against him for publicly criticizing their job performances.  Approximately six weeks before the state court granted summary judgment in favor of the defendants, Dr. Sadid was fired from his position in the College of Engineering.

Dr. Sadid later brought suit in this Court alleging that President Vailas; Dean Jacobsen; Graham Garner, the public relations director for ISU; and Dr. David Beard, the lone dissenter on the grievance committee, violated his civil rights, notably his rights to

speech and due process, and committed various state law torts by terminating him and by publishing the circumstances of his termination in the student newspaper.

The defendants moved for summary judgment on the grounds that, among other things, Dr. Sadid's claims are barred by res judicata and each defendant is entitled to qualified immunity.  Dr. Sadid moved for partial summary judgment on his due process claims.  The court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367, and will grant the defendant's motion for summary judgment and deny Dr. Sadid's motion for summary judgment.

## BACKGROUND

From 1994 until 2009, Dr. Sadid worked as a tenured professor at ISU in the College of Engineering.  *First Amend. Compl.*, Dkt. 39, ¶¶ 14-15.  During his tenure, Dr. Sadid criticized the university's and college's administrations as inept, corrupt, and secretive.  Dr. Sadid first levied these claims over a planned merger of the College of Engineering with the College of Technology that he felt was developed without necessary faculty and community input.  Dkt. 124 at 6.  Initially, Dr. Sadid voiced his displeasure in a letter to ISU faculty and administrators.  *Id.*  When the plan resurfaced, he took his argument to the public in a guest column that appeared in the regional newspaper, the *Idaho State Journal*.  *Id.*

Close to this time, Dr. Sadid was the subject of what he believed were retaliatory acts taken by the administration in response to his criticisms.  *Id.*  The allegations of retaliation included the defendants' failure to perform his yearly evaluation between 2001

and 2006, not being appointed as the chair of the College of Engineering in 2006, and

being disparaged in an email written by a colleague in 2008.  *Id.*  These acts prompted

Dr. Sadid to sue ISU and the author of the email in state court for (1) violating his First

Amendment rights, (3) breaching his employment contract and the covenant of good faith

and fair dealing, and (3) defaming his character.  *Id.* at 7.  Dr. Sadid filed his suit in the

District Court for the Sixth Judicial District of Idaho on September 29, 2008.  *Sadid v.*

*Idaho State Univ.*, Case No. CV-2008-39420C. [1]

 While his lawsuit was pending, Dr. Sadid continued to criticize university and

college administrators, most notably President Vailas and Dean Jacobsen, in his columns

published in the local newspaper and in his interactions with staff and colleagues.  *See,*

*e.g.,* Dkt. 88-5, Ex. D; Dkt. 88-6, Ex. E.  On November 16, 2008, Dr. Sadid published a

guest column in the *Idaho State Journal* entitled "Are President Vailas's policies

damaging ISU?"  In the column, Dr. Sadid claimed that President Vailas "[paid] only lip-

service to education," abused his power, retaliated against opposing voices, created a

culture of cronyism, and was using ISU as a stepping stone to a more prestigious

institution.  *Dkt.* 88-3 at 2.

 Dr. Sadid's clashes with the administration carried over into a faculty meeting

presided over by Dean Jacobsen on April 21, 2009.  At the start of the meeting, Dr. Sadid

---

[1] The Court takes judicial notice of the filings in the state court litigation, as well as the state court docket entry report, entitled "ROA Report."  *See generally* Fed. R. Evid. 201 (court, either upon request or sua sponte, may take judicial notice of adjudicative facts when such facts are capable of accurate and ready determination by resort to sources "whose accuracy cannot reasonably be questioned").

criticized the college's faculty evaluation process as arbitrary and potentially damaging to professors' careers, citing his own mediocre evaluation as an example of an unjustifiable result. *Audio Recording of Apr. 21, 2009 Meeting,* Dkt. 102, Ex. B, at 00:05:29 to 00:18:00.[2]  During a discussion about an upcoming review of the college, Dr. Sadid emphasized the need for faculty input and attacked President Vailas for failing to change what he described as a culture of corruption that had plagued the university for over twenty years. *Id.* at 00:35:28 to 00:36:38.   In response to other attendees' concerns over infighting in the college, Dr. Sadid stated that "[Dean Jacobsen] was the only person responsible for creating friction among faculty." *Id.* at 01:11:28.

After this meeting, Dean Jacobsen issued to Dr. Sadid a notice of contemplated action ("NOCA").  Dkt. 91, Ex. F.  The NOCA informed Dr. Sadid that Dean Jacobsen was considering recommending Dr. Sadid for dismissal, in part, because his "aggressive, angry, and hostile outbursts have created tension and a sense of fear among much of the administrative staff." *Id.* at 3.  Dean Jacobsen invited him to a private meeting to present "any reason, evidence, or information in opposition to that contemplated action." *Id.* The meeting, however, did not change Dean Jacobsen's mind, and he recommended to President Vailas that Dr. Sadid be terminated from his position. *See* Dkt. 92, Ex. I.

On August 4, 2009, President Vailas informed Dr. Sadid of Dean Jacobsen's recommendation and placed Dr. Sadid on administrative leave until President Vailas made the final decision. *Id.* at 2.  President Vailas indicated, however, that he would

---

[2] The time notations refer to hours: minutes: seconds.  All times are noted as precisely as possible.

withhold his decision until Dr. Sadid presented his case to the university's grievance committee in accordance with ISU's policies. *See id.* Attached to President Vailas's letter was a five-page memorandum prepared by Dean Jacobsen.

The memorandum stated that Dean Jacobsen believed Dr. Sadid should be dismissed for cause and listed several examples of his behavior that contributed to Dean Jacobsen's conclusion. *Id.* at 15-20. For example, it stated that Dr. Sadid made "several accusatory, threatening, and denigrating comments about [Dean Jacobsen] and other individuals," *id* at 16, and made "obscene gestures" at a provost and his spouse, *id.* at 19. The letter also cites staff member Patricia Goldbeck's need to be "hyper-sensitive around Dr. Sadid" lest she end up on his "blacklist." *Id.* at 18. The most specific example of the tension allegedly caused by Dr. Sadid's actions can be found in the following passage describing the reaction of Annie Havlicak, a staff member, to an argument between Dr. Sadid and Dean Jacobsen:

> Also, [Havlicak] once overheard, from her office, Dr. Sadid yelling in an angry voice at me in my office. Given her prior history in witnessing Dr. Sadid loudly and angrily berating the former Dean in a classroom – at a time when she was an engineering student some years earlier – *she experienced severe anxiety and fear of imminent violence*, to the extent that she prepared an escape plan from her office, planning to crawl up through the drop ceiling in order to avoid Dr. Saadid [sic]."

*Id.* at 17 (emphasis added).

On August 27, 2009, shortly after Vailas suspended him, Dr. Sadid moved to amend his state court complaint. Dkt. 85-1 at 66-77. In the amended complaint, which accompanied the motion, Dr. Sadid argued the amendment was necessary to account for

"continued . . . retaliat[ion] against [him] . . . for exercising his rights to freedom of speech." *Id.* at 72.  He listed Dean Jacobsen's recommendation and President Vailas's suspension order as examples of retaliatory acts, and, on the basis of those acts, added them as defendants to the suit.  *Id.* at 68-69, 72-73.

While Dr. Sadid's motion to amend awaited resolution, the original defendants to his suit filed a motion for summary judgment.  Dkt. 124 at 7.  In response, Dr. Sadid moved for additional time to conduct discovery.  *Id.*  The state court granted Dr. Sadid an extension of time, granted his motion to amend, and scheduled a hearing on the defendants' motion for summary judgment for November 2, 2009.  In light of reopening discovery, the court allowed Dr. Sadid and the defendants to set a mutually agreeable due date for Dr. Sadid's opposition memorandum and the defendants' reply brief.  *See Oct. 26, 2009 Minute Entry & Order*, *Sadid v. ISU et al,* Case No. CV2008-3942-OC (Idaho State Court, Bannock County) ("The Court will not set a new briefing schedule, and will leave that to the parties to negotiate.").  Afterward, Dr. Sadid filed his opposition papers on October 30, 2009.  *See State Court ROA Report,* October 30, 2009 entries.

Meanwhile, Dr. Sadid's grievance proceeding was underway at ISU.  The proceedings lasted for several weeks as Dr. Sadid and the administration presented their cases.  Among the witnesses who testified during the hearing process were Goldbeck, Havlicak, and a third staff member, Ronda Mahl.  Each woman testified that the confrontation between Dr. Sadid and Dean Jacobsen that the NOCA referenced made them fear for their safety, although each also stated that Dr. Sadid had never directly

threatened them with violence.  *See Goldbeck Depo*., Dkt. 87-1 at 4-5 and Dkt. 88-22 at

5; *Havlicak Depo*., Dkt. 87, Ex. 1 at 55-57 and Dkt. 88-21 at 3-6; *Mahl Depo*., Dkt. 87-1

at 2 and Dkt. 88-23 at 6.[3]  At the conclusion of the hearing, the grievance committee

recommended that Dr. Sadid be reinstated.  Dkt. 88-11 at 2.  The committee's

recommendation, however, was not binding on President Vailas.

President Vailas rejected the committee's recommendation and terminated Dr.

Sadid's employment.  *See* Dkt. 88-13.  President Vailas explained his reasoning to Dr.

Sadid in a letter dated October 29, which stated that Dr. Sadid's termination was effective

"at the end of business" the next day – October 30, 2009.  *Id.*  at 10.  "One of the most

compelling issues" to President Vailas was the abusive nature of and toxic atmosphere

created by Dr. Sadid's behavior.  *Id.* at 3.  The strongest evidence for his conclusion was

Goldbeck's, Mahl's, and Havlicak's testimony, *id.* ¶ 1, but their testimony was by no

measure the only evidence President Vailas cited to support his conclusion, *id.* ¶¶ 2, 4, 7-

8, 12, 15.

Coincidentally, the parties completed their state-court summary-judgment

briefing on October 30, 2009 – the same day Dr. Sadid's termination was to become

effective.  *See State Court ROA Report.*  A few days later, on November 2, 2009, the state

court heard argument on the defendants' motion for summary judgment, and issued its

ruling on December 18, 2009.  Dkt. 124.  The court "deem[ed] the summary judgment

---

[3] Goldbeck's, Mahl's, and Havlicak's actual testimony before the grievance committee is not
part of the record.  However, the parties seem to agree, or at least do not openly dispute, that the
women's deposition testimony is consistent with their testimony before the grievance committee.

**MEMORANDUM DECISION AND ORDER - 7**

motion to be against the [a]mended [c]omplaint and against all defendants." *Id.* at 8.  The court granted the defendants' motion for summary judgment on all counts, *id.* at 28, and the Idaho Supreme Court affirmed the judgment, *Sadid v. Idaho State University*, 265 P.3d 1144 (Idaho 2011).

While the summary judgment motion was pending, Dr. Sadid's discharge garnered a significant amount of attention in the local and college press.  The *Idaho State Journal* ran an article entitled "Prof. Fired."  The article detailed the circumstances surrounding Dr. Sadid's termination and quoted from the portion of President Vailas's termination letter that discussed Goldbeck's, Mahl's, and Havlicak's safety concerns. Dkt. 87 at 22.  Following that story, the *ISU Bengal* published an article insinuating that the decision to terminate Dr. Sadid was political.  *See* Dkt. 88-15.  That article prompted Garner to issue a statement explaining Dr. Sadid's termination.   The *ISU Bengal* published Garner's statements in a second article on November 18, 2009.  The article quotes Garner as saying, "This firing was not politically motivated . . . However, [Dr. Sadid] presented a lot of safety issues.  There were many individuals who filed reports where they claimed Sadid threatened them." *Id.*

Ultimately, Dr. Sadid chose to forego the option of appealing President Vailas's termination decision to the Idaho State Board of Education ("Board").  Instead, he filed this suit on March 15, 2011.  He alleges seven claims for relief against all defendants as follows:

> First, he alleges defendants violated his First Amendment rights by firing him because of his speech during the faculty meeting.

Second, Dr. Sadid alleges two procedural due process violations:  (1) that the NOCA and the August 4, 2009, letter failed to provide him adequate notice of the grounds for which he was terminated; and (2) that his criticisms of President Vailas disqualified Vailas from passing judgment on his employment status.[4]

Third, Dr. Sadid alleges that by labeling him a safety concern in the media, the defendants violated his substantive due process right to continue his career as a professor.

Fourth, he alleges that the defendants arbitrarily singled him out for termination in violation of the Equal Protection Clause of the Fourteenth Amendment.

Fifth, he alleges that defendants tortiously interfered with the "tenure contract" between Dr. Sadid and ISU.

Sixth, Dr. Sadid alleges that the publication labeling him a safety concern defamed his reputation.

Seventh, and finally, Dr. Sadid alleges that defendants intentionally inflicted emotional distress upon him, based upon the aggregate of these acts.

*See First Am. Compl.*, Dkt. 39.

Broadly speaking, these claims differ from the claims alleged in state court because they were triggered by later events – namely, Dr. Sadid's firing and comments made after the firing.  The state-court complaint did not include claims based on these later events, focusing instead on earlier, alleged retaliatory acts, such as, for example, the defendants' alleged failure to conduct Dr. Sadid's annual performance evaluations.  This case is now before the Court on the parties' cross-motions for summary judgment.

---

[4] The amended complaint generally alleges a procedural due process violation.  *See First Am. Compl.,* Dkt. 39, ¶¶ 102-05.  The more specific theories underlying this claim are fleshed out in the briefs.

## LEGAL STANDARD

Summary judgment is appropriate where a movant can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a).  When the non-moving party bears the burden of proof at trial, the moving party may carry its initial burden by "produc[ing] evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, . . . [by showing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  "Once the moving party carries its initial burden, the adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but must provide affidavits or other sources of evidence that set forth specific facts showing that there is a genuine issue for trial." *Deveraux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc) (internal quotation marks omitted).

Because the parties are before the Court on cross-motions for summary judgment, the Court has considered each motion on its own merits.  *See Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## ANALYSIS

### 1.    Res Judicata

Defendants first argue that the favorable resolution they received in the state court suit bars all of Dr. Sadid's claims against all of the defendants in this suit under the

doctrine of res judicata.  Idaho law controls the resolution of this issue.  *See* 28 U.S.C. §

1738; *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 326 (9th Cir. 1995)

("Federal courts must give the same preclusive effect to state court judgments that those

judgments would be given in that state's own courts.").

In Idaho, res judicata includes both claim preclusion and issue preclusion.  *Andrus*

*v. Nicholson*, 186 P.3d 630, 633 (Idaho 2008).  It is clear from defendants' motion,

however, that they use res judicata to refer to claim preclusion only.  *Def.'s Br.* at 2-9,

Dkt. 84.  Overly simplified, claim preclusion bars a subsequent suit between (1) the same

parties (2) on the same claim (3) when the first suit ended in final judgment.  *Andrus*, 186

P.3d at 633.

Here, even assuming all three elements were satisfied, res judicata does not bar

any of the seven claims Dr. Sadid brings in this later lawsuit.  Although both lawsuits are

indeed based upon the "same transaction or series of transactions," *see id.*, thus satisfying

the "same claim" component of the res judicata inquiry, the claims alleged in this second

lawsuit were not ripe for adjudication in state court.[5]  As discussed below, Idaho has

---

[5] The Court will discuss the "same claim" element below.  The other elements – "the same
parties" and the "final judgment" elements – need not be discussed in any detail.  As for the
"final judgment" element, Dr. Sadid does not dispute that the state court ended in a final
judgment on the merits.  *See Pl.'s Resp.*, Dkt. 102, at 1-4.  As for the "same parties" element, this
is plainly met for defendants Vailas and Jacobsen, who were named defendants in the underlying
suit.  By contrast, this element is not met for defendants Garner and Dr. Beard.  These defendants
were not named in the state suit and they failed to show that they were in privity with any of the
state-court defendants.  *See, e.g., Gubler v. Brydon*, 867 P.2d 981, 985 (Idaho 1994) (holding that
the defendants' unsubstantiated claims that they were exposed to liability due to their partnership
with a defendant in a prior suit prevented a finding of privity).  Thus, defendant Graham and Dr.
Beard's res judicata argument fails for this additional, independent reason.

**MEMORANDUM DECISION AND ORDER - 11**

adopted a ripeness exception to the res judicata doctrine, and that exception applies here. *See generally Duthie v. Lewiston Gun Club*, 663 P.2d 287, 290 (Idaho 1983).

### A. Same Claim

Two cases are based upon the "same claim" when they arise out of the "same transaction or series of transactions." *Diamond v. Farmers Group, Inc.*, 804 P.2d 319, 323 (Idaho 1990). What constitutes the same "transaction" must be determined "'pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" *Andrus*, 186 P.3d at 633 (quoting the Restatement (Second) of Judgments § 24 (1982)). "A valid and final judgment rendered in an action extinguishes all claims arising out of the same transaction or series of transactions out of which the cause of action arose." *Diamond*, 804 P.2d at 323.

A comparison of Dr. Sadid's state case with this one reveals that they were spurred by the same series of transactions. At points, the two cases are directly connected. The events immediately preceding Dr. Sadid's termination were not only the substance of his amended state complaint, they form the basis of his procedural due process, equal protection, and tortious interference claims here. *Compare* Dkt. 85-1 ¶¶ 24, 26-28, *with Pl.'s Br.* at 6-14, Dkt. 88-1. Dr. Sadid's ongoing disparagements of President Vailas and his administration were central to his state court suit and are central to his claim in this suit that Vailas was constitutionally prohibited from sitting as the final

arbiter over whether he would keep his job.

Nor can one draw a real distinction between Dr. Sadid's past criticisms of the administration's competency and his speech at the April 21, 2009, faculty meeting, which was cited by President Vailas as a basis for his termination.  His critique of the faculty evaluation process during the faculty meeting was nothing more than another verbal grenade lobbed from a common arsenal.

To be sure, not all of the facts and legal theories which are important to this suit have been carried over from the state court suit.  For example, in the underlying suit, Dr. Sadid was not yet complaining that Vailas was a biased decisionmaker.  But these sorts of differences do not alter the Court's conclusion that, broadly speaking, the two suits are based upon the same series of transactions.  "[T]he transactional concept of a claim is broad and . . . claim preclusion may apply even where there is not a substantial overlap between the theories advanced in support of a claim [] or in the evidence relating to those theories."  *Ticor Title Co. v. Stanion*, 157 P.3d 613, 620 (Idaho 2007) (internal quotation marks omitted); *Andrus*, 186 P.3d at 633 (claim preclusion bars all claims "which might and should have been litigated in the first suit" (quoting *Joyce v. Murphy Land & Irrigation Co.*, 208 P. 241, 242-43 (Idaho 1922)).

### B.    The Ripeness Exception

If a claim is not ripe for adjudication in the first suit, claim preclusion will not bar the plaintiff from raising it in a second suit.  *Duthie*, 663 P.2d at 290.  The Idaho Supreme Court has not squarely answered precisely when a claim is ripe for inclusion in the first

suit.  In *Bell Rapids Mut. Irrigation Co. v. Hausner*, 890 P.2d 338 (Idaho 1995), however, the court suggested two potential cut-off dates:  First, ripeness could be determined from the date the complaint was filed in the first suit.  Second, ripeness could be determined from the date the first suit was "submitted to the trial court for decision."  *Id.* at 340. Therefore, it is the Court's obligation to predict which cut-off date the Idaho Supreme Court would choose.  *See McKown v. Simon Prop. Group Inc.*, 689 F.3d 1086, 1091 (9th Cir. 2012).

In *Consolidated Ag of Curry, Inc. v. Rangen, Inc.*, 912 P.2d 115 (Idaho 1996), the Idaho Supreme Court arguably decided this issue.  There the court reversed the trial court's decision that the plaintiff's claim for waste should be dismissed because the plaintiff did not wait until the end of the lease to bring suit.  *Id.* at 117.  Relying on *Bell Rapids*, the court held that the waste claim was not premature because the plaintiff "was trying to recover for the waste that had occurred up to the time of trial," whereas, "[a]ny claim for waste that occurred after the trial would [have been] premature."  *Id.*  While the Idaho Supreme Court's treatment of the ripeness issue in *Con. Ag* was brief, its later decision in *Berkshire Investments, LLC v. Taylor*, 278 P.3d 943 (Idaho 2012), further illuminated the issue.

In *Berkshire*, the court confronted the plaintiffs' attempt to set aside an earlier judgment in the defendants' favor related to the sale of real property held in trust.  *Id.* at 947.  The prior suit turned on whether a disclaimer issued by the defendants divested them of their status as trust beneficiaries and, therefore, their standing to challenge the

trustee's sale of property to the plaintiffs. *Id.* at 948-49. After the trial court held that the disclaimer had no such effect in the first suit, the plaintiffs filed a second suit asserting several claims that were all based on the theory that the defendants misrepresented the effect of the disclaimer to the first trial court. *Id.* at 949. The second trial court held that the first suit was res judicata on the second and granted summary judgment for the defendants in the second suit. *Id.* at 950. The Idaho Supreme Court agreed with the trial court's res judicata holding. *Id.* at 953. Turning to the plaintiffs' argument that their misrepresentation claims were not ripe for adjudication in the first suit, the court stated:

> However, all of the conduct on which those claims are based . . . occurred and was made known to the [plaintiffs] while [the first suit] was pending, *before Judge Wilper even proceeded to the merits of the case.* Accordingly, any claim arising from that conduct ripened at that time and should have been raised.

*Id.* (emphasis added). Therefore, it appears that the Idaho Supreme Court has settled on the date of submission – meaning the date the trial court is in a position to "proceed to the merits" – as the relevant cut-off date.

A potential fly in *Berkshire*'s treatment of the issue is *Hindmarsh v. Mock*, 57 P.3d 803 (Idaho 2002). In *Hindmarsh*, the Idaho Supreme Court held that a final judgment in small claims court for property damage precluded a second personal injury suit when both claims arose from the same collision. *Id.* at 806. The court also held that Hindmarsh could not rely on the ripeness exception because her "claim for physical injuries was ripe *at the commencement* of the small claims court litigation." *Id.* (emphasis added). It appears, however, that the court was making a factual statement, not

clarifying a rule of law.

Any doubt left by *Hindmarsh* is dispelled both by *Berkshire's* treatment of the res judicata question and by the notion that the later cut-off date is more consistent with Idaho's broad definition of a "claim" for the purposes of claim preclusion. Claim preclusion exists to "protect the courts against burdens of repetitious litigation and to protect individuals from the harassment of repetitive claims." *Ticor Title Co.*, 157 P.3d at 619. It promotes the full airing of grievances and the complete resolution of cases. *See Hindmarsh*, 57 P.3d at 806 (Idaho 2002) ("[P]laintiffs in small claims cases will not feel obliged to present all of their claims or all of their evidence[] knowing there is no preclusive effect to the small claims decision . . . ."). Each of these policies is better served by selecting the date of submission as the cut-off date, because that date further incentivizes parties to bring all of their related claims in one suit and litigate that suit to the fullest.

Dr. Sadid argues that the appropriate cut-off date was the date he filed his first amended complaint (October 15, 2009), because the "timeline" for filing a second amended complaint had passed.[6] *Pl.'s Resp.*, Dkt. 102, at 3-4. This argument is not

---

[6] There was no formal "timeline" for amendments imposed by the state court. *See Oct. 26, 2009 State Court Minute Entry & Order* ("after the summary judgment, if the case remains, the Court will send its regular scheduling order for a new trial schedule in the above-captioned matter"). The timeline Dr. Sadid refers to is apparently based upon his independent conclusion that the end of August was the latest possible date an amendment would be allowed. Theoretically, under Idaho Rule of Civil Procedure 15, Dr. Sadid could have sought to amend his complaint after he was fired *and* after the summary-judgment motion had been submitted to the trial court for decision. *See generally* Idaho R. Civ. P. 15 (a) (in addition to some rights to amend a pleading as a matter of course, "a party may amend a pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires . . . ."). The

without merit.  *See generally Velikonja v. Ashcroft*, 355 F. Supp. 2d 197, 202-05 (D.D.C. 2005) ("The law in this Circuit does not require constant amendments each time plaintiff learns of a new action that could be claimed to be retaliatory or discriminatory.").  But choosing the date the amended complaint was filed as the cut-off date seems to be foreclosed under Idaho law.

For the same reason, the Court declines the defendants' invitation to choose a much later date – the date that judgment is entered – as the relevant cut-off date.  *Def.'s Br.*, Dkt. 84, at 4.  To support this argument, defendants cite *Bedke v. Salazar*, No. CV-09-339, 2010 WL 2000052 (D. Idaho May 19, 2010).  There, this Court quoted a Ninth Circuit opinion for the proposition that "the doctrine of res judicata bars the relitigation of all events which occurred prior to entry of judgment, and not just those acts that happened before the complaint was filed.'"  *Id.* at *6 (quoting *Monterey Plaza Hotel Ltd. P'ship v. Local 483, Hotel Emps.*, 215 F.3d 923, 927-28 (9th Cir. 2000)).  The problem with that statement is that it is not Idaho law.  The Ninth Circuit was relying on California law for its pronouncement in *Monterey Plaza*.  215 F.3d at 928 (citing *Eichman v. Fotomat Corp.,* 147 Cal. App. 3d 1170, 1177 (1983)).  Because the Idaho Supreme Court seems to have settled on the date the case is submitted as the cut-off date, this Court is obligated follow its lead.

---

defendants fault Dr. Sadid for not doing precisely that.  The Court, however, has concluded that res judicata does not bar claims that ripen after a case is submitted to the trial court for decision. As will be explained, defendants failed to demonstrate that the claims Dr. Sadid alleges here ripened before that time.

C.      **The Date of Submission**

Of course settling on the date of submission as the relevant cut-off date raises

another question: When is a case submitted for summary judgment?  The relevant cases

from the Idaho Supreme Court discussing ripeness and the Idaho Rules of Civil

Procedure lead to the conclusion that "the date of submission" means the date the parties

have submitted their briefs and the evidentiary record is complete.  In *Bell Rapids*, the

Idaho Supreme Court found it unnecessary to choose between the two potential cut-off

dates because the claims the plaintiff brought in the second suit arose after the parties had

developed the factual record and submitted their briefs to the court.  *Bell Rapids*, 890

P.2d at 340; *cf. Con. Ag.*, 912 P.2d at 117 (holding the plaintiff could recover from waste

that had "occurred up to the time of trial").   Similarly, Rule 56(c) of the Idaho Rules of

Civil Procedure provides the party opposing summary judgment the right to supplement

the record with its affidavits up to fourteen days prior to the hearing date on the motion

for summary judgment.  After that time, any supplemental affidavits, interrogatories, or

deposition testimony may only be submitted at the court's discretion.  Idaho R. Civ. P.

56(e).  Thus, from a factual standpoint, a case is submitted for the purposes of summary

judgment when the opposing party's right to supplement the evidentiary record has

ended.  In this case, Dr. Sadid filed his opposition papers, including supporting affidavits,

on October 30, 2009.  *See State Court ROA Report.*  So October 30, 2009 is the cut-off

date here.

With this date in mind, the Court easily concludes that three of Dr. Sadid's seven

claims – (1) his third claim for substantive due process violations; (2) his sixth claim for defamation; and (3) his seventh claim for intentional infliction of emotional distress – are not precluded.  Each of these claims depends on Garner's comments that appeared in the article "Administration Explains Firing."  As noted earlier, this article was published on November 18, 2009 – after the October 30, 2009 cut-off.  Therefore, these claims were not ripe for adjudication in the state court action.

Applying the October 30, 2009 cut-off date to the other four claims is more difficult.  These claims include Dr. Sadid's First Amendment, procedural due process, equal protection, and tortious interference with contract claims.[7]  All these claims depend upon Dr. Sadid being fired.  Absent the firing, there was no retaliatory act, the sufficiency of the notice that Dr. Sadid received cannot be assessed, President Vailas had not acted as a decisionmaker, and Dr. Sadid's employment contract remained in effect.  Therefore, those claims were not ripe until Dr. Sadid was terminated.

And therein lies the difficulty.  As already explained, Dr. Sadid was fired in an October 29, 2009 letter, which indicated that the firing was effective at the end of the next day, October 30, 2009.  And October 30, 2009 is the very day Dr. Sadid filed his opposition brief.  So the question is, which happened first:  Did Dr. Sadid file his summary judgment papers before or after he was terminated?  The record on this point is incomplete; it does not indicate how the letter was sent, when it was received, or even what time of day the parties considered to be the "end of business."  As such, defendants

---

[7] These claims are Dr. Sadid's first, second, fourth, and fifth claims for relief.

have failed to demonstrate that undisputed facts entitle them to summary judgment on their res judicata affirmative defense.  *See generally Nissan Fire & Marine Ins. Co. v. Fritz Co.,* 210 F.3d 1099, 1102-1103 (9th Cir. 2000) (explaining moving party's burden on summary judgment); *see also Berkshire*, 278 P.3d at 953 (concluding that those claims which were ripe and "made known to [the plaintiffs]" were precluded in the second suit).

But even assuming Dr. Sadid received his termination letter *before* he filed his summary-judgment briefing, the Court believes the ripeness exception would still apply in this factually unique case.  The Idaho Supreme Court created the ripeness exception to avoid the overly rigid application of claim preclusion that would deprive a diligent plaintiff of his day in court.  *See Duthie*, 663 P.2d at 290 ("[H]owever, sometimes a single trial covering all aspects of the case will be neither desirable nor feasible. Evidence bearing upon one aspect of a case may be unduly prejudicial with respect to another. Or certain matters may be ripe for trial while consideration of others would be premature.").  When it did so, the court was aware that the exception may require defendants to re-litigate some factual matters.  *Id.*  In other words, sometimes it is acceptable to split a claim.

Splitting Dr. Sadid's claim makes sense for at least two reasons.

First, the Court cannot say Dr. Sadid was derelict in his obligation to pursue his termination-based claims in state court, given that his termination was effective the same day he filed his summary judgment brief.  Some measure of practicality and equity must be applied.  It would not be practical or equitable to require Dr. Sadid to bring his

termination claims to the state court's attention almost immediately upon being fired. *See generally Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 481 n.22*,* (1982) ("For the plaintiff to be precluded from again raising [a] claim, he must have previously received a 'full and fair opportunity' to litigate it.") (citation omitted).

Second, after ruling on the defendants' summary-judgment motion, the state court made it abundantly clear that it was dealing "only with those allegations of retaliation that came before August 27, 2009." *See Feb. 24, 2010 State Court Decision on Mtn. for Reconsideration,* Dkt. 86, at 64. (The state court selected August 27, 2009 because that is when Dr. Sadid moved to amend his original state-court complaint.).

For all these reasons, Dr. Sadid's First Amendment, procedural due process, equal protection, and tortious interference claims are not barred by the res judicata doctrine.

## 2.     Statute of Limitations

Defendants next argue that Dr. Sadid's § 1983 claims are time barred. The Court is not persuaded.

The parties agree that a two-year limitations period applies to these claims. Dr. Sadid's § 1983 claims are based primarily on a discrete act – his October 2009 termination. *See generally Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Discrete acts such as termination . . . are easy to identify.") Dr. Sadid filed this action in March 2011 – well within two years of his termination. *Cf. id.* at 113 ("The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related

discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.").

**3.      Qualified Immunity**

"[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).  It "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 132 S.Ct. 1235, 1244 (2012) (internal quotation marks omitted).

Qualified immunity is a two-step inquiry.  First, do the facts taken in a light most favorable to the plaintiff make out the violation of a constitutional right? *Id.* at 232.  Second, was the law "clearly established" at the time of the violation.  *Id.*  Under the second prong, "[c]ourts do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *C.F. ex rel. Farnan  v. Capistrano Unified School Dist.*, 654 F.3d 975, 986 (9th Cir. 2011) (internal quotation marks omitted).  The contours of the right must be described with reasonable particularity, rather than cast at a high level of generality.  *Id.*  The purpose is to ensure the law gives fair notice to government officials so that "a reasonable official would

understand that what he is doing violates that right." *Id.* (internal quotation marks omitted).

Dr. Sadid bears the burden of demonstrating that the right was clearly established. *Sorrells v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). Furthermore, he must identify what role, if any, each individual defendant had in violating his constitutional rights. *See Gerhart v. Lake County*, 637 F.3d 1013, 1024 (9th Cir. 2011).

### A.    First Amendment Retaliation

In the employment context, courts apply the *Pickering* balancing test in its evolved form to evaluate First Amendment retaliation claims. *Johnson v. Poway Unified School Dist.*, 658 F.3d 954, 961 (9th Cir. 2011). In its present form, the *Pickering* test involves five sequential steps:

(1)    whether the plaintiff spoke on a matter of public concern;

(2)    whether the plaintiff spoke as a private citizen or public employee;

(3)    whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action;

(4)    whether the state had an adequate justification for treating the employee differently from other members of the general public; and

(5)    whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). Dr. Sadid bears the burden of proof on the first three elements. *Id.* at 1070-71. If Dr. Sadid can carry his initial burden, the defendants have the burden on the fourth and fifth elements. *Id.* at 1071. If, however, Dr. Sadid fails to satisfy his burden on any one of the first three elements, the inquiry is

over, and the defendants are entitled to qualified immunity.  *Id.*  The defendants

challenge Dr. Sadid on the first and second prongs of the test.[8]  Resolution of this issue

hinges on the second prong, although for reasons related to the first prong.

      The second prong of the evolved *Pickering* balancing test was created by the

Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006).  Under *Garcetti*,

a public employee's speech made in the course of his official duties is not protected by

the First Amendment.  *Id.* at 421.  However, the Court left open an exception for

university professors, who "necessarily speak and write pursuant to their official duties."

*Id.* at 438 (Souter, J., dissenting) (internal quotation marks and alteration omitted); *id.* at

425 (majority opinion).  Dr. Sadid does not challenge the defendant's argument that his

speech during the faculty meeting was made during the course of his employment, except

to say that his speech falls into this "academic freedom" exception.  *See Pl.'s Resp.*, Dkt.

102, at 11.  Dr. Sadid's argument fails to show that his speech is clearly protected by the

academic freedom exception to *Garcetti*.

      The exception arose from the majority's concern that "expression related to

academic scholarship or classroom instruction" may implicate "additional constitutional

interests that are not fully accounted for by [the] Court's customary employee-speech

jurisprudence."  *Id.* at 425.  As this language and the line of cases from which this

exception flows demonstrate, the exception  relates to "academic scholarship or

---

[8] The defendants argue they can demonstrate that Dr. Sadid would have been terminated
irrespective of his speech at the faculty meeting as a matter of law.  They have waived this
argument by raising it for the first time in their reply brief.

**MEMORANDUM DECISION AND ORDER - 24**

classroom instruction." *Id.* It exists to protect the "robust exchange of ideas which discovers the truth out of a multitude of tongues," *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (internal quotation marks omitted), and to foster an "atmosphere which is conducive to speculation, experiment and creation," *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring) (internal quotation marks omitted). The right is clearly offended by labeling a professor's scholarship or teaching methods taboo.

The relevant cases on which Dr. Sadid relies support this principle. In *Sweezy v. New Hampshire*, Justice Frankfurter joined with a separate plurality of justices to overturn a contempt conviction entered against a guest lecturer at the University of New Hampshire, Paul Sweezy. *Id.* at 260. Sweezy was held in contempt when, after being asked by the New Hampshire Attorney General if his lecture espoused Marxist ideas, he responded under oath that he would not discuss the substance of his lecture, but stated that he did not advocate the forceful overthrow of the United States government. *Id.* With Sweezy's assurance in hand, Justice Frankfurter concluded that the "dependence of a free society on free universities" meant "the exclusion of governmental intervention" that might chill the free flow of ideas. *Id.* at 262-63. While the plurality of justices ultimately based their holding on due process grounds, those justices agreed that the attorney general's questions offended Sweezy's "liberties in the areas of academic freedom and political expression." *Id.* at 250.

*Kerr v. Hurd*, 694 F. Supp. 2d 817 (S.D. Ohio 2010), and *Hardy v. Jefferson*

*Community College*, 260 F.3d 671 (6th Cir. 2001), are no different.  In *Kerr,* the Southern District of Ohio held that a medical professor's teachings on forceps-assisted vaginal delivery fell within the academic exception to *Garcetti*.  694 F. Supp. 2d at 844.  In *Hardy*, the Sixth Circuit held that a professor's right to use the words "nigger" and "bitch" during a classroom discussion on the power of words to marginalize and oppress outweighed the college's interest in regulating offensive speech.[9]  260 F.3d at 682.

The Ninth Circuit's case law reaffirms the idea that academic freedom protects a professor's right to teach controversial subjects.  *See Farnan*, 654 F.3d at  988 (holding no clear line delineates when a teacher's right to engage in a controversial discussion of religion and history must give way to a student's right to be free from religious hostility, if such a line exists at all); *cf. Rodriguez v. Maricopa Cnty. Cmty. College*, 605 F.3d 703, 709 (9th Cir. 2010) (holding that the college's academic freedom protected its right to allow a professor to make racially charged remarks during a cultural debate).  However, even disciplining a professor for his classroom speech will not necessarily expose a college administrator to civil liability.  *See Cohen v. San Bernardino Valley College*, 92 F.3d 968, 971-73 (9th Cir. 1999) (holding that college administrators were entitled to qualified immunity despite disciplining a professor under an overly broad harassment policy for using "derogatory language, sexual innuendo, and profanity" during his lectures).

---

[9] The Sixth Circuit ultimately remanded the case to give the college administrators a chance to show there were permissible academic reasons for not renewing Hardy's teaching contract. *Hardy*, 260 F.3d at 683.

As this discussion shows, the speech involved in each one of these cases directly related to the speaker's research and teaching or to his contributions to a scholarly discussion.   Dr. Sadid's speech at the faculty meeting is not easily understood as doing so.  His complaints regarded his beliefs that the faculty evaluations were arbitrary, the college's fundraising was insufficient, and the administration was unresponsive.  They were generalized and displayed his personal dissatisfaction with the way the college and the university were being run.  At no point did Dr. Sadid tie his grievances to his, or any other professor's, research, scholarship, or teaching.  To the extent his comments touched on those subjects, they did so at only the most abstract level.

This is not to say that the issue of funding or the evaluation process can never be used to "cast a pall of orthodoxy over the classroom." *Keyishian v. Board of Regents of Univ. of New York*, 385 U.S. 589, 603 (1967).   But the contours of the exception blur when the connection between the speech and scholarship is so attenuated.  The blurring occurs because the First Amendment does not constitutionalize the employee grievance process nor does it require the retention of insubordinate employees.  *See, e.g., Connick v. Meyers*, 461 U.S. 138, 154 (1983) ("The limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships."); *Eng*, 552 F.3d at 1070 ("'[I]ndividual personnel disputes and grievances' . . . that would be of 'no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern.'") (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973

(9th Cir. 2003)).  Dr. Sadid has not pointed to a single case that suggests, much less holds, that every word spoken by a university professor that concerns the manner in which a university is run is part of his academic freedom.  *Cf.* J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment,"* 99 Yale L.J. 251, 262-67 (1989) (distinguishing academic freedom from other civil rights associated with universities).

President Vailas and Dean Jacobsen believed that Dr. Sadid's speech at the faculty meeting fell into the category of unprotected personnel grievances and insubordination. Their belief was objectively reasonable given the absence of case law drawing the line of demarcation between the outer reaches of the academic freedom exception and a professor's unprotected concerns over the administration of the university.  Therefore, the defendants are entitled to qualified immunity on Dr. Sadid's First Amendment claim.  *Cf. Hong v. Grant*, 403 Fed. Appx. 236, 237-38 (9th Cir. 2010) (unpublished disposition) (affirming district court's grant of summary judgment to university officials based on qualified immunity, observing, "It is far from clearly established today, much less in 2004 when the university officers voted on Hong's merits increase, that university professors have a First Amendment right to comment on faculty administrative matters without retaliation.").

## B.    Procedural Due Process Claims

The procedural aspect of the Due Process Clause guaranteed Dr. Sadid notice of his impending termination and a pretermination hearing.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).  Dr. Sadid claims he was deprived of both.

### i.      Notice

Dr. Sadid alleges that he did not receive adequate notice of the grounds on which he was ultimately terminated.  More specifically, he argues that he was unaware that Goldbeck's, Mahl's, and Havlicak's concerns over their safety due to his actions would be used to justify his termination.  "The standard for what amounts to constitutionally adequate notice . . . is fairly low; it's 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objection.'"  *Espinosa v. United Student Aid Funds, Inc.*, 553 F.3d 1193, 1202 (9th Cir. 2008) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).  "The purpose of notice is to allow a complainant to marshall a case against the firing body."  *Bignall v. N. Idaho College*, 538 F.2d 243, 247 (9th Cir. 1978).

Two documents informed Dr. Sadid of his impending termination: the NOCA issued by Dean Jacobsen and the August 4, 2009, letter written by President Vailas.  In the NOCA, Dean Jacobsen cited Dr. Sadid's "aggressive, angry and hostile outbursts [that] created tension and a sense of fear among much of the administrative staff in the college." Dkt. 91 at 3.  President Vailas's letter and the attached memorandum expanded upon that concern, and referenced several incidents where Dr. Sadid acted in a belligerent manner toward his colleagues.  These examples support Goldbeck's and Mahl's generalized fear that Dr. Sadid's hostility toward his colleagues might someday escalate into physical violence.  Moreover, the letter specifically cited Havlicak's severe anxiety

and fear of imminent violence.  That portion of the letter matches Havlicak's testimony during the grievance hearing.  Dr. Sadid cannot now claim that he was caught unawares by Goldbeck's, Mahl's, and Havlicak's testimony during his grievance hearing.

Moreover, Dr. Sadid's fixation on Garner's use of the phrase "safety issue" in the *Bengal* article is a red herring.  It was the generalized fear among the staff that Dr. Sadid's past conduct might someday escalate that led President Vailas to conclude Dr. Sadid created a hostile work environment.  President Vailas never suggested Dr. Sadid engaged in acts of violence, as Dr. Sadid's argument suggests.  Garner's  poor choice of words do not alter the stated reasons for Dr. Sadid's dismissal.

Dr. Sadid's additional arguments in support of his notice claim are also unpersuasive.  Dr. Sadid faults the August 4, 2009, letter in part because it was not concise, lacked a "section entitled 'statement of charges,'" and failed to link "specific factual assertions to specific causes for termination."  *Pl.'s Reply*, Dkt. 111, at 4.  Section titles aside, the letter, including Dean Jacobsen's memorandum, is six pages long and each of the examples cited by the Court in its analysis can be found in those six pages. The letter is hardly unconstitutionally vague or overly long.  Dr. Sadid's complaint that the letter failed to link "specific factual assertions to specific causes for termination" misunderstands the meaning of "cause."  As the letter explains, "'adequate cause' means one or more acts or omissions which, singly *or in the aggregate*," constitute grounds for dismissal.  If anything, an attempt to portray a specific allegation as an independent ground for dismissal could have created greater confusion as to why Dr. Sadid was fired,

because it was the aggregate of his actions which led to his dismissal, as President Vailas's letter explained.  Therefore, the Court concludes that Dr. Sadid was adequately notified of the grounds for his termination.

### ii.     Impartial Decisionmaker

Dr. Sadid's second procedural due process theory is based on his contention that President Vailas could not decide whether to terminate Dr. Sadid's employment because he was biased.  President Vailas makes four arguments in response.  First, he contends that Dr. Sadid "waived" his right to challenge President Vailas's ability to act as a decisionmaker by failing to raise the argument prior to being terminated.  Second, he argues that Dr. Sadid has not established that he was biased.  Third, he suggests due process does not require that he act as an impartial decisionmaker, because Dr. Sadid could have appealed his termination to the State Board of Education.  Finally, he argues that, assuming Dr. Sadid was entitled to an impartial decisionmaker at the pretermination stage, that right was not clearly established.

### a.     Waiver

President Vailas's argument that Dr. Sadid "waived" his right to an impartial decisionmaker by failing to raise the specter of Vailas's partiality is not without some appeal.  A rule requiring a party to voice his objections to the process at time when a meaningful opportunity to take corrective action exists does not seem onerous, especially given the presumption of honesty and integrity afforded to state decisionmakers.  *Cf. Flangas v. State Bar of Nevada*, 655 F.2d 946, 950 (9th Cir. 1981) (holding that attorney

could not challenge his suspension in federal court because he had not raised the issue of bias to the Nevada Supreme Court).  However, the Court ultimately disagrees that Dr. Sadid has waived his right to challenge President Vailas's alleged partiality.

The right to an impartial decisionmaker is a fundamental guarantee of due process that is "jealously guarded."  *Clements*, 69 F.3d at 333 (internal quotation marks omitted).  As such, "federal courts 'indulge every reasonable presumption against [its] waiver . . .' and 'do not presume acquiescence in [its] loss.'"  *See Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 969 (9th Cir. 2011) (per curiam) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  "Such a waiver should not be implied and should not be lightly found."  *Id.*

 Moreover, the Ninth Circuit rejected a similar argument in *Stivers v. Pierce*, 71 F.3d 732 (9th Cir. 1995).  There, Stivers claimed he was denied an impartial tribunal because a business rival was a member of the licensing board that denied his application for private investigator, private patrolman, and process server licenses.  *Id.* at 736.  The court rejected the board's argument that Stivers had waived his challenge to the board's impartiality in part because there was no statutorily mandated process by which Stivers could challenge the board's makeup.  *Id.* at 748.  The same is true here.  While Dr. Sadid had the ability to challenge the makeup of the grievance committee, Dkt. 92 at 10, ¶ 7.b, no similar procedure, statutory or otherwise, existed for him to raise the issue of President Vailas's alleged bias.  Therefore, the Court concludes that Dr. Sadid did not waive this claim.

### b.    Bias

#### 1.    Was there a Right to an Impartial Decisionmaker at the Pretermination Hearing?

The Fourteenth Amendment does not require that an employee necessarily receive the full panoply of due process rights at a pretermination hearing where the available post-termination procedures protect those rights.  *See Loudermill*, 470 U.S. at 545.  The right to an impartial decisionmaker is one right that may be dispensed with at a pretermination hearing, "so long as due process is provided in a post-termination hearing."  *Walker v. City of Berkeley*, 951 F.2d 182, 184 (9th Cir. 1991).  The reason being is that the pretermination hearing is designed to be "an initial check against mistaken decisions," *Loudermill*, 470 U.S. at 545, as opposed to a formal adjudication of the matter, *see Clements*, 69 F.3d at 333 n.15.  President Vailas relies on this reasoning to argue that he was not required to be impartial because Dr. Sadid could appeal his termination to the Board.  The Court does not agree.

"It is well-settled that the Due Process Clause requires . . . 'a fair trial in a fair tribunal.'"  *Stivers*, 71 F.3d at 741 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955).  *Walker*'s holding that there is no right to an impartial decisionmaker at a pretermination hearing is based upon the informal nature of the proceedings typically employed at the pretermination stage, and it is expressly conditioned on the complainant's ability to receive his full due process rights at the post-termination hearing.  *Walker*, 951 F.2d at 184.  The same is true of each of the cases on which the *Walker* court relied.  *Duchesne v. Williams,* 849 F.2d 1004, 1008 (6th Cir. 1988) (en banc) ("We acknowledge that there

may be cases-perhaps this is one of them-in which the supervisory official is so biased that the *Loudermill* 'right-of-reply' process is meaningless. The full, post-termination, adversary, trial-type hearing will serve to ferret out bias, pretext, deception and corruption by the employer in discharging the employee."); *Schaper v. City of Huntsville,* 813 F.2d 709, 716 (5th Cir. 1987) ("Elaborate pretermination proceedings are not mandated here because of the excessive burden they would put on the government's interest in quickly removing an unsatisfactory employee. But in the event of minimal pretermination safeguards, the substantial private interest one has in not being deprived of his livelihood requires a full hearing after termination." (internal citation and quotation marks omitted)).  Thus, where a meaningful review before an impartial decisionmaker is not necessarily afforded at the post-termination stage, the burden is on the government to conduct the pretermination hearing in a manner that affords the grievant all the process that he is due.

To be constitutionally sound, the government must guarantee a complainant a meaningful opportunity to respond to the evidence and to make an argument against a proposed deprivation.  *Vanelli v. Reynolds School Dist. No. 7*, 667 F.2d 773, 780 (9th Cir. 1980) ("An individual must have an opportunity to confront all the evidence adduced against him, in particular that evidence with which the decisionmaker is familiar.").  A neutral decisionmaker must preside over that hearing, or else it is meaningless.  *Clements*, 69 F.3d at 333 ("A biased proceeding is not a procedurally adequate one.").  A review of the procedures governing dismissals leads to the conclusion that Dr. Sadid had a right to

an impartial decisionmaker at his pretermination hearing.

The Board's "Governing Policies and Procedures" states that "[i]n each case the issue of whether or not adequate cause exists should be determined fairly by the institution or agency recognizing and affording protection to the rights of the employee and to the interests of the Board and its institutions or agencies."  Dkt. 103-2 at 24, ¶ 4.  It further states that each university "shall have a process that provides employees with written notice of contemplated discipline and an opportunity to be heard."  *Id.* ¶ 4.a.

Pursuant to this mandate, ISU provides professors the right to challenge an adverse employment decision through its grievance process.  Dkt. 92 at 3-14.  The grievance process involves both an informal and a formal component.  *Id.* at 7, ¶ 2.  The informal component consists of an "opportunity to meet with the person(s) making the recommendation of suspension, dismissal, or termination to present any reasons, evidence or information in mitigation or opposition to the recommendation."  *Id.*

At the formal stage, the burden is on the university to "substantiate that adequate cause exists."  *Id.*  It requires the grievance committee consisting of five members selected by the faculty, the administration, and the grievant to convene.  *Id.* at 8, ¶ 6.  The committee members, the administration, and the complainant have the right to call witness, and witness "have the responsibility to respond as though summoned by the [p]resident of the [u]niversity." *Id.* at 12, ¶ 8.f.(5).  During the hearing, the grievant has the right to be represented, to testify, and to question witnesses.  *Id.* at 12, ¶ 8.f.(5), (7).  Once the evidentiary phase is complete, the committee must issue a recommendation to

the president and to the complainant.  *Id.* ¶ 11.  The president then makes the ultimate

decision to terminate the employee or not.  *Id.* at 13, ¶ 9.  These procedures mirror those

normally used in a "full, post-termination, adversary, trial-type hearing."  *Duchesne,* 849

F.2d at 1008.

In contrast to the mandatory procedures guarantee at the university level are the

discretionary procedures that may be employed by the Board on appeal.  Any appeal of

the President's decision is not a matter of right, but is conditioned on the Board accepting

the matter.  Dkt. 103-2 at 25, ¶ 4.b.  If the Board accepts the appeal, it "may . . . approve,

reject, or amend" the university president's findings, or it "may remand the matter for

additional evidence, recommendations, or suggestions." *Id.* (emphasis added).  Finally, an

employee does not have to petition the Board for an appeal "to exhaust administrative

remedies for the purposes of judicial review."  *Id.* at 26.

At least within the sphere of public universities, Idaho has placed the primary

burden on the universities to provide grievants with the bulk of their due process rights.

Dr. Sadid's only guaranteed opportunity to meet the evidence presented against him came

at the formal stage of the university-level proceedings. Had he chosen to pursue his

appeal, it would have been uncertain whether the Board would have chosen to hear his

case.  Even if the Board heard Dr. Sadid's appeal, there was no guarantee that Dr. Sadid

would have had the opportunity to introduce evidence of President Vailas's bias.

Moreover, the fact that it is unnecessary for a grievant to appeal to the Board before

seeking judicial review strongly suggests that the university-level decisionmaking

process is meant to be final.  Therefore, the Court concludes that due process required

that Dr. Sadid's case be evaluated by an impartial decisionmaker at the university level.

The Idaho Supreme Court's decision in *Allen v. Lewis-Clark State College*, 670

P.2d 854 (Idaho 1983), on which President Vailas relies, does not alter the Court's

conclusion.  Allen was discharged from his position as the director of campus security at

Lewis-Clark State College by the college's president because of his racist remarks to a

local newspaper.  *Id.* at 858.  Allen appealed his dismissal to the State Board of

Education, which affirmed the president's decision after a de novo hearing on the facts.

*Id.* at 858-59.  Allen then challenged his dismissal in state court, alleging that, *inter alia*,

the college president was biased against him.  *Id*. at 868.

When the case reached the Idaho Supreme Court, the court held that these

procedures "fully comported with due process."  *Id.* at 871.  The procedures followed in

Allen's case appear to be largely the same as those used in Dr. Sadid's case.  Allen was

provided an informal meeting and a hearing before a faculty grievance committee, and

the decision to terminate his employment was made by the college president.  *Id.* at 870.

However, there are two key distinctions.  First, Allen's ability to appeal the president's

decision to the Board seems to have been a matter of right.  *See id.* ("Mr. Allen was

granted the right to appeal [the president's] decision to the State Board of Education.");

*id.* at n.9 ("This letter informed Mr. Allen in general terms of the reasons for his

dismissal and also informed him of his right to appeal his dismissal.").  Second, the

Board gave Allen a full, de novo evidentiary hearing, although it is unclear whether a de

novo hearing was required.  *Id.*  Had Dr. Sadid been guaranteed similar treatment by the
Board, that guarantee would likely alter the Court's conclusion.  The Board's procedures
for handling appeals as they currently stand, as opposed to how they appear to have stood
in 1983 when *Allen* was decided, however, do not afford Dr. Sadid the same assurances.
Therefore, *Allen* is distinguishable.

## 2.      Was that Right Clearly Established?

The Ninth Circuit has lamented "the uncomfortable coexistence of balancing tests
and [the] 'clearly established rights' standard,'" especially in the realm of procedural due
process.  *Brewster v. Bd. of Educ. of the Lynwood Unified School Dist.*, 149 F.3d 971,
987 (9th Cir. 1998).  The discomfort stems from two competing principles:  first, that due
process "is not a technical conception with a fixed content unrelated to time, place and
circumstances," but is "flexible and calls for such procedural protections as the particular
situation demands"; second, that the "clearly established" standard is a particularized
undertaking that eschews generalization.  *See id.* at 977, 983 (internal quotation marks
omitted).

In his termination letter, President Vailas stated his understanding of what process
was required before Dr. Sadid could be terminated.

> My understanding is that due process in this context essentially consists of
> notice and an opportunity to be heard prior to a proposal to terminate
> employment occurs.  I believe the notice of contemplated action issued in
> May, the opportunity to meet with [Dean Jacobsen] informally in July, and
> then the more detailed recommendation of dismissal prepared by the Dean
> and issued with the formal notice of recommendation issued on August 4,
> 2009, gave Dr. Sadid ample notice of the charges and more than adequate
> time for Dr. Sadid and his counsel to prepare for his opportunity to be heard

> on these issues at the hearing. . . . Dr. Sadid had nearly six weeks to prepare for the hearing, which commenced on September 16, 2009, and reconvened over a period of several days, finally ending on October 22, 2009.  The record in this matter is voluminous and it appears Dr. Sadid had every opportunity to call witnesses, present exhibits and testify on his own behalf.

*Dkt.* 88-13 at 8.  President Vailas's explanation is accurate but incomplete, because it omits the need to ensure the involvement of an impartial decisionmaker.

However, in light of *Loudermill*, *Walker*, and numerous other cases discussing the informal nature of the typical pretermination hearing, the Court's conclusion that Dr. Sadid was entitled to an impartial decisionmaker at his pretermination hearing seems to be an exception to the generally understood rule.  Thus, President Vailas's belief, based upon the Idaho Supreme Court's decision in *Allen*, that the Board could – and would – cure any problems his involvement created, was not objectively unreasonable.  *Allen* demonstrates that the Board had fulfilled its post-termination role in the past, and there was nothing in the record before President Vailas which suggested they would not have done so here had Dr. Sadid requested their review of the termination decision.  Therefore, President Vailas is entitled to qualified immunity on Dr. Sadid's impartial decisionmaker claim.

In reaching this conclusion, the Court does not pass judgment on whether President Vailas's involvement as the final decisionmaker was constitutionally permissible.  The Court only concludes that the right to an impartial decisionmaker, in the unique circumstances presented here, was not clearly established at that point in time, and that President Vailas was therefore not objectively unreasonable in concluding that he

could act as a decisionmaker without violating Dr. Sadid's due process rights.

### C.     Equal Protection

Dr. Sadid's class-of-one equal protection claim based on his termination fails to make out a constitutional violation.  In *Enquist v. Oregon Department of Agriculture* (*Enquist I*), the Ninth Circuit held "that the class-of-one theory of equal protection is inapplicable to decisions made by public employers with regard to their employees." 478 F.3d 985, 996 (9th Cir. 2007).   The Supreme Court upheld that categorical ruling. *Engquist v. Or. Dep't of Ag. (Enquist II)*, 553 U.S. 591, 607 (2008) ("[T]he class-of-one theory of equal protection has no application in the public employment context . . . ."). Thus, Dr. Sadid's class-of-one equal protection claim based on his termination fails to make out a constitutional violation.

Dr. Sadid argues that the Ninth Circuit's and Supreme Court's holdings do not control the resolution of this claim because President Vailas's decision to terminate his employment also implicated his First Amendment and due process rights.  *Pl.'s Resp.* Dkt. 102, at 14.  However, part of the reason the class-of-one theory of equal protection is a poor fit in the employment context is because of "the number of other legal protections that public employees enjoy."  *Engquist I*, 478 F.3d at 996.  To the extent that Dr. Sadid's constitutional rights were harmed by Vailas's decision, he has availed himself of the independent avenues open to him to redress those injuries.  His class-of-one theory, however, is a dead end.

### D.    Substantive Due Process Claim

The substantive component of the Due Process clause of the Fourteenth Amendment protects Dr. Sadid's right to pursue his chosen occupation. *Enquist I*, 478 F.3d at 998.  To state a claim for relief, Dr. Sadid must show that the defendants took action that was akin to placing his name on a "government blacklist, which when circulated or otherwise publicized to prospective employers effectively exclude[d] [him] from his occupation." *Id.* at 997(internal quotation marks omitted).  Only in "extreme cases" is relief warranted. *Id.*

Dr. Sadid argues that Garner's comments explaining why Dr. Sadid was fired in an article in the *ISU Bengal* on November 18, 2009, meet this standard.  Given the tragic events at Virginia Tech and similar school shootings, the argument goes, labeling him a safety concern in a publicly distributed newspaper article effectively ended his hopes of continuing his career as a professor.[10]

Nonetheless, Dr. Sadid has failed to create a genuine issue for trial on the question of whether the defendant's conduct caused the harm.  On October 31, 2009, eighteen days before Garner's statements appeared in the *ISU Bengal*, the *Idaho State Journal* published an article discussing the details of Dr. Sadid's termination.  Dkt. 87 at 22-23. The article quoted a portion of President Vailas's termination letter in which President Vailas expressed his concerns over Dr. Sadid's behavior. *Id.* at 23.  In his deposition, Dr.

---

[10] The parties disagree over whether Dr. Sadid's occupation is as a professor or engineer.  It is unnecessary to answer this question, because Dr. Sadid's claim fails under either designation.

Sadid admitted that he provided the termination letter to a reporter at the *Idaho State Journal*. *Sadid Depo*, Dkt. 87 at 26. The defendants are not liable for any harm that Dr. Sadid inflicted upon himself. *See Llamas v. Butte Cmty. College Dist.*, 238 F.3d 1123, 1131 (9th Cir. 2001) (stating, in a procedural due process context, that "to allow the potentially stigmatized party to satisfy the publication prong by disseminating the details surrounding his termination would contradict the purposes of the publication requirement").

Furthermore, any attempt to separate the harm, if any, caused by Garner's comments rather than Dr. Sadid's prior self-publication of the same concerns over his behavior would be speculative. The task is inherently troublesome to begin with because of the narrow time frame in which the two publications were made. It becomes an exercise in futility in light of the only evidence Dr. Sadid has offered in support of the causation element, i.e., the affidavit of David Delehanty, a professor of biology at ISU.[11] Dkt. 39 at 108-114. Dr. Delehanty does not address Dr. Sadid's self-publication, let alone offer a way to unravel the two events from each other. All Dr. Delehanty offers is his conclusion that "[i]t would be very difficult for [Dr. Sadid] to obtain employment at another school or university with a prior administration alleging he was a safety threat."

---

[11] Defendants filed a motion to strike the affidavit testimony of Mikle Ellis, Richard Wabrek, and David Delehanty. (Dkt. 104). Plaintiff agrees that Mikle Ellis and Richard Wabrek's affidavits are not properly before the court. Dkt. 114. Therefore, those affidavits will be stricken from the record. The defendant's motion with respect to Delehanty's affidavit is denied. *See Braswell v. Shoreline Fire Dept*, 622 F.3d 1099, 1103 (9th Cir. 2010) (holding that a fire chief's lay testimony created a genuine issue of material fact on a substantive due process claim).

*Id.* at 111, ¶ 27.  Merely showing that the defendants' "stigmatizing conduct has some adverse effect on [his] job prospects" is not enough; "instead, the employee must show that the stigmatizing actions make it virtually impossible for the employee to find new employment in his chosen field." *Engquist I*, 478 F.3d at 998.  Therefore, Dr. Sadid has failed to show a genuine issue exists for trial.

### 4.    Dr. Sadid's State Law Claims

The above rulings dispense with all of Dr. Sadid's federal claims.  District courts enjoy discretion in deciding to either retain or decline supplemental jurisdiction over state law claims after the federal claims have been dismissed.  *Satey v. JP Morgan Chase & Co.*, 521 F.3d 1087, 1091 (9th Cir. 2008).  In exercising its discretion, the court must consider whether retaining or declining jurisdiction will best accommodate "the objectives of economy, convenience and fairness to the parties, and comity." *Trustees of Constr. Indus. & Laborers Health & Welfare Trust v. Desert Valley Landscape & Maintenance, Inc.*, 333 F.3d 923, 925 (9th Cir. 2003).  The fact that the federal claims giving rise to federal jurisdiction no longer remain in a case, however, weighs in favor of a decision to decline supplemental jurisdiction.

> [I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims.

*Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988). "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between

the parties by procuring for them a sure-footed reading of applicable law." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

In this case, deciding whether to retain or decline jurisdiction of the state law claims is a close call.  On the one hand, this case has been on this Court's docket for two years and the defendants' motion for summary judgment on these claims is fully briefed. This weighs in favor of retaining jurisdiction.

On the other hand, the Court is not convinced that the parties will obtain a quicker resolution of their state law claims here.  Granted, plaintiff would technically have to start over in state court, but it seems that the state court could quickly proceed to the merits of the three remaining state law claims.  The dismissal of plaintiff's federal claims has significantly narrowed the scope of this litigation, and discovery is complete.  So it would be entirely feasible for the defendants to quickly re-file their pending motions related to the state law claims in state court.  Indeed, the Ninth Circuit has repeatedly upheld the district court's exercise of its discretion to decline supplemental jurisdiction over remaining state claims after it granted summary judgment on the federal claims. *See, e.g., Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 911 (9th Cir. 2011) (upholding district court's decision to decline to exercise jurisdiction over state-law claims after granting the defendants summary judgment on the plaintiff's ADA accessibility claim).

Further, this Court has not yet set a trial date nor has it has not evaluated the merits of the state law claims – which Idaho state courts are in a better position to do anyway. And, based on the Court's preliminary review of the state law claims, it appears that the

defamation claim raises complex issues of Idaho state law, which is another factor weighing against retaining jurisdiction.  28 U.S.C. § 1367(c)(1).  Finally, a key reason this case has remained before this Court for such a lengthy period is that the Court has an extraordinarily full docket.[12]  The state courts may well be in a position to move to the merits of this case more quickly than this Court could.

Ultimately, however, before deciding whether to retain jurisdiction over the state claims, the Court would like to have the parties' input.  The parties are therefore invited to submit simultaneous briefs (not to exceed five pages) on this point within ten days of this order.  The Court will then determine whether to retain jurisdiction over the state law claims.

## CONCLUSION

For the foregoing reasons, the court will grant the defendants' motion for summary judgment with respect to all of Dr. Sadid's federal claims, but will deny without prejudice defendants' motions for summary judgment on his state law claims, pending a decision whether to retain supplemental jurisdiction over those claims.   Therefore, **IT IS ORDERED THAT:**

1.     Defendant's Motion for Summary Judgment (Dkt. 83) is **GRANTED** with regard to plaintiff's federal claims, but **DENIED WITHOUT PREJUDICE** with regard to his state law claims.

---

[12] The Court has an aspirational goal of deciding all motions within 30 to 45 days after the briefing is complete.  That quite clearly did not happen in this case, and the Court offers its apology.

3.      Plaintiff's Motion for Partial Summary Judgment (Dkt. 88) is **DENIED.**

4.      Defendant's Motion to Strike (Dkt. 104) is **GRANTED IN PART and DENIED IN PART.**

5.      Plaintiff's Motion for Leave to File a Sur Reply (Dkt. 112) is **DENIED WITHOUT PREJUDICE.**

6.      Defendant's Motion to Amend (Dkt. 117) is **DENIED WITHOUT PREJUDICE.**

7.      The parties are invited to file simultaneous briefs (not to exceed five pages) within ten days concerning whether the Court should retain jurisdiction of the state law claims.



DATED: March 28, 2013

B. Lynn Winmill
Chief Judge
United States District Court

**MEMORANDUM DECISION AND ORDER - 46**