UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HABIB SADID,<br><br>                        Plaintiff,<br><br>         v.<br><br>ARTHUR VAILAS, RICHARD JACOBSEN, GRAHAM GARNER, DAVID BEARD, and JOHN/JANE DOES I through Z, whose true identities are presently unknown,<br><br>                        Defendant. | Case No. 4:11-cv-00103-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

In March 2013, this Court granted summary judgment to the defendants on all of plaintiff Habib Sadid's federal claims.  The only remaining claims are Dr. Sadid's state-law claims for tortious interference with contract, defamation, and intentional interference with emotional distress.  Defendants seek summary adjudication of these claims as well.

Before ruling on these state-law claims, the Court invited the parties to indicate whether they wanted the Court to retain jurisdiction, now that the federal claims are gone.

Both parties asked the Court to retain jurisdiction.  Accordingly, and for the reasons further explained below, the Court will retain jurisdiction of the state-law claims and rule on defendants' pending motions for summary judgment of these claims.[1]

The Court will grant defendants' motions for summary judgment of plaintiff's claims for emotional distress and interference with contract.  The Court will also summarily adjudicate Dr. Sadid's defamation claim against Dr. Beard, but will deny defendant Garner's motion for summary judgment on the defamation claim against him.

## FACTS

A full recitation of the relevant facts can be found in the Court's March 28, 2013 Order.[2]  *See* Dkt. 128.  A brief synopsis is as follows:

From 1994 until 2009, Dr. Sadid worked as a tenured professor at ISU in the College of Engineering.  *First Amend. Compl.*, Dkt. 39, ¶¶ 14-15.  During his tenure, Dr. Sadid criticized the university's and college's administrations as inept, corrupt, and secretive.  After a particularly contentious faculty meeting in April 2009, Dean Richard Jacobsen issued a notice of contemplated action (NOCA) to Dr. Sadid.  Dkt. 91, Ex. F.  The NOCA informed Dr. Sadid that Dean Jacobsen was considering recommending Dr.

---

[1] Plaintiff asks the Court to immediately rule on his April 2, 2013 Motion for District Court to Certify a Final Judgment Per Federal Rule of Civil Procedure 54(b) or, in the alternative, to Certify the Applicable Memorandum Decision and Order, Dkt. 128, Per 28 U.S.C. § 1292.  The Court declines to do so.  Assuming plaintiff still wishes to pursue that motion after this decision is issued, the Court will address the motion when it ripens.  At this point, the motion is not fully briefed.

[2] The legal standard governing motions for summary judgment is also set out in the March 28 Order and will not be repeated here.

Sadid for dismissal, in part, because his "aggressive, angry, and hostile outbursts have created tension and a sense of fear among much of the administrative staff." *Id.* at 3. Dean Jacobsen invited him to a private meeting to present "any reason, evidence, or information in opposition to that contemplated action." *Id.* The meeting, however, did not change Dean Jacobsen's mind, and he recommended to President Vailas that Dr. Sadid be terminated from his position. *See* Dkt. 92, Ex. I.

On August 4, 2009, President Vailas informed Dr. Sadid of Dean Jacobsen's recommendation and placed Dr. Sadid on administrative leave until President Vailas made the final decision. *Id.* at 2. President Vailas indicated, however, that he would withhold his decision until Dr. Sadid presented his case to the university's grievance committee in accordance with ISU's policies. *See id.* Attached to President Vailas's letter was a five-page memorandum prepared by Dean Jacobsen.

The memorandum stated that Dean Jacobsen believed Dr. Sadid should be dismissed for cause and listed several examples of his behavior that contributed to Dean Jacobsen's conclusion. *Id.* at 15-20. For example, it stated that Dr. Sadid made "several accusatory, threatening, and denigrating comments about [Dean Jacobsen] and other individuals," *id* at 16, and made "obscene gestures" at a provost and his spouse, *id.* at 19. The letter also cites staff member Patricia Goldbeck's need to be "hyper-sensitive around Dr. Sadid" lest she end up on his "blacklist." *Id.* at 18. The most specific example of the tension allegedly caused by Dr. Sadid's actions can be found in the following passage describing the reaction of Annie Havlicak, a staff member, to an argument between Dr.

Sadid and Dean Jacobsen:

> Also, [Havlicak] once overheard, from her office, Dr. Sadid yelling in an angry voice at me in my office.  Given her prior history in witnessing Dr. Sadid loudly and angrily berating the former Dean in a classroom – at a time when she was an engineering student some years earlier – *she experienced severe anxiety and fear of imminent violence*, to the extent that she prepared an escape plan from her office, planning to crawl up through the drop ceiling in order to avoid Dr. Saadid [sic]."

*Id.* at 17 (emphasis added).

In any event, Dr. Sadid's grievance hearing lasted for several weeks as Dr. Sadid and the administration presented their cases.  Among the witnesses who testified during the hearing process were Goldbeck, Havlicak, and a third staff member, Ronda Mahl. Each woman testified that the confrontation between Dr. Sadid and Dean Jacobsen referenced in  the NOCA made them fear for their safety, although each also stated that Dr. Sadid had never directly threatened them with violence.  *See Goldbeck Dep.*, Dkt. 87-1 at 4-5 and Dkt. 88-22 at 5; *Havlicak Dep.*, Dkt. 87, Ex. 1 at 55-57 and Dkt. 88-21 at 3-6; *Mahl Dep.,* Dkt. 87-1 at 2 and Dkt. 88-23 at 6.[3]  At the conclusion of the hearing, the grievance committee recommended that Dr. Sadid be reinstated.  *See* Dkt. 88-11 at 2. The committee's recommendation, however, was not binding on President Vailas.

President Vailas rejected the committee's recommendation and terminated Dr. Sadid's employment.  *See* Dkt. 88-13.  President Vailas explained his reasoning to Dr.

---

[3] Goldbeck's, Mahl's, and Havlicak's actual testimony before the grievance committee is not part of the record.  However, the parties seem to agree, or at least do not openly dispute, that the women's deposition testimony is consistent with their testimony before the grievance committee.

Sadid in a letter dated October 29, which stated that Dr. Sadid's termination was effective "at the end of business" the next day – October 30, 2009.  *Id.*  at 10.  "One of the most compelling issues" to President Vailas was the abusive nature of and toxic atmosphere created by Dr. Sadid's behavior.  *Id.* at 3.  The strongest evidence for his conclusion was Goldbeck's, Mahl's, and Havlicak's testimony, *id.* ¶ 1, but their testimony was by no measure the only evidence President Vailas cited to support his conclusion, *id.* ¶¶ 2, 4, 7-8, 12, 15.

Dr. Sadid's discharge garnered a significant amount of attention in the local and college press.  The *Idaho State Journal* ran an article entitled "Prof. Fired."  The article detailed the circumstances surrounding Dr. Sadid's termination and quoted from the portion of President Vailas's termination letter that discussed Goldbeck's, Mahl's, and Havlicak's safety concerns.  Dkt. 87 at 22.  Following that story, the *ISU Bengal* published an article suggesting that the decision to terminate Dr. Sadid was political.  *See Dkt. 88-15*.  That article prompted Garner to issue a statement explaining Dr. Sadid's termination.   The *ISU Bengal* published Garner's statements in a second article on November 18, 2009.  The article quotes Garner as saying, "This firing was not politically motivated . . . However, [Dr. Sadid] presented a lot of safety issues.  There were many individuals who filed reports where they claimed Sadid threatened them." *Id.*

In March 2011, Dr. Sadid filed this action.  As noted above, his complaint includes claims for interference with contract, intentional infliction of emotional distress, and defamation.

## ANALYSIS

**1.      Supplemental Jurisdiction of Dr. Sadid's State-Law Claims**

Even though all the federal claims in this action have been dismissed, the Court has discretion to retain jurisdiction of the state-law claims. *See Satey v. JP Morgan Chase & Co.*, 521 F.3d 1087, 1091 (9th Cir. 2008). After reviewing the parties briefing on this point, *see* Dkts. 132, 133, the Court has determined that retaining jurisdiction would best accommodate the objectives of economy, convenience, fairness to the parties, and comity. *Trustees of Constr. Indus. & Laborers Health & Welfare Trust v. Desert Valley Landscape & Maintenance, Inc.*, 333 F.3d 923, 925 (9th Cir. 2003). As previously noted, this case has been on the Court's docket for over two years and the defendants have moved for summary judgment on all pending claims. The factual issues giving rise to the state claims are closely related to the federal claims and the Court is now familiar with the complicated factual and procedural history of this case. Further, as the parties have explained, retaining jurisdiction likely will avoid piecemeal appeals from this Court. The Court will therefore retain jurisdiction of the state-law claims. *See, e.g., Munger v. Glasgow Police Dep't*, 227 F.3d 1082, 1089 n.4 (9th Cir. 2000) (district court properly retained jurisdiction of state law claims where they were based on the same factual allegations as the federal claims and the district court was fully familiar with the record).

**2.      Intentional Infliction of Emotional Distress**

Turning to the merits of Dr. Sadid's state-law claims, the Court concludes that the

intentional infliction of emotional distress claim is not viable.  To prove this claim, a plaintiff must show that: "(1) the defendant's conduct was intentional or reckless, (2) the conduct was extreme and outrageous, (3) there was a causal connection between the wrongful conduct and the plaintiff's emotional distress, and (4) the emotional distress was severe."  *Johnson v. McPhee*, 210 P.3d 563, 572 (Idaho Ct. App. 2009).  "Liability for this intentional tort is generated only by conduct that is very extreme.  The conduct must be not merely unjustifiable; it must rise to the level of 'atrocious' and 'beyond all possible bounds of decency,' such that it would cause an average member of the community to believe that it was outrageous."  *Id.* (citing *Edmonson v. Shearer Lumber Prods.*, 75 P.3d 733, 741 (Idaho 2003).

        None of Dr. Sadid's allegations about his termination, including his allegations regarding defendants' post-termination comments, approach the sort of extreme conduct where plaintiffs have recovered for emotional distress in connection with a discharge. *See Holmes v. Union Oil Co. of Cal.*, 760 P.2d 1189, 1197 (Idaho Ct. App. 1988) (citing *Alcorn v. Anbro Engineering, Inc.*, 468 P.2d 216 (Cal. 1970) (supervisor made abusive and racially motivated remarks when terminating employee) *and Agis v. Howard Johnson Co.*, 355 N.E. 2d 315 (Mass. 1976) (manager fired waitresses in alphabetical order to coerce them into disclosing whether one was stealing from the restaurant)).  As explained in the Court's March 28, 2013 Order, *see* Dkt. 128, Dr. Sadid's firing did not violate any of his civil rights and the fact that a university professor is fired, in and of itself, is not "very extreme" conduct – even assuming it was unjustifiable.  Similarly, Garner's

comments to the newspaper reporter shortly after the termination were not "atrocious" and "beyond all possible bounds of decency."  After all, Dr. Sadid had previously published information about his termination; Garner was responding to Dr. Sadid's statements; and Garner's comments were arguably *based on* the actual reasons for Dr. Sadid's termination.

Note, however, that "based on" is a key term here.  That is, Dr. Garner said that many individuals reported that Dr. Sadid threatened them and, indeed, Dr. Sadid's termination letter says he was terminated, in part, because some women felt threatened by his behavior.  It did not say, however, that Dr. Sadid *directly threatened* anybody, and, viewing the facts favorably to the plaintiff, that is what Garner implied when he spoke to the reporter.  Nevertheless, although this factual dispute precludes summary judgment of Dr. Sadid's defamation claim, Garner's conduct cannot be viewed as extreme and outrageous enough to support Dr. Sadid's emotional distress claim.  In other words, Garner may have defamed Dr. Sadid, but, viewed in context, his doing so cannot be seen as "extreme and outrageous" conduct, particularly when there is a good argument that his statements were substantially accurate.  This point is discussed further below, in connection with the Court's ruling on Dr. Sadid's defamation claim.

### 3.      Tortious Interference with Contract By A Third Party

Dr. Sadid's tortious interference with contract claim also fails.  A basic principle underlying this claim is that "a party cannot tortiously interfere with its own contract." *Ostrander v. Farm Bureau Mut. Ins. Co. of Idaho, Inc.*, 851 P.2d 946, 950 (Idaho 1993).

Dr. Sadid does not dispute that defendants were acting within the course and scope of their employment with ISU in the alleged activities that led to Dr. Sadid's termination.[4] As a result, Dr. Sadid is arguing that ISU, though its agents, interfered with its own contract. Idaho Courts have squarely rejected such claims. *See, e.g., id.* ("Since "Hart's actions with respect to Ostrander were within the scope of his authority as an agent of Farm Bureau, there was no third party to the contract."); *Jenkins v. Boise Cascade Corp.,* 108 P.3d 233, 243 (Idaho 1993) (same). The Court will therefore grant defendants' motion for summary judgment of Dr. Sadid's interference with contract claim.

## 4. Defamation

The Court cannot grant summary judgment on Dr. Sadid's entire defamation claim, however. There are two allegedly defamatory communications in this case: (1) Dr. Beard's forwarding the minority report to a newspaper; and (2) Garner's comments about Dr. Sadid's termination to a newspaper reporter, as quoted in the November 18, 2009 *ISU Bengal* article entitled *Administration Explains Firing.*

The defamation claim against Dr. Beard is easily resolved because there is no evidence that Dr. Beard sent the minority report to the press, as Dr. Sadid claims. *See Defendants' Statement of Undisputed Facts,* Dkt. 83-1, ¶ 16. Further, Dr. Sadid did not

---

[4] Defendants argued that they were immune to suit on this claim under the Idaho Tort Claims Act. *See Mot. Mem.*, Dkt. 84, at 20-21. Within that argument, they said "there is no evidence in the record showing that any of the Defendants acted outside the course and scope of their employment or with malice or criminal intent . . . ." *Id.* In responding to this argument, Dr. Sadid did not take issue with the "course and scope of employment" argument; instead he focused on the "malice or criminal intent" issue. *Resp.,* Dkt. 102, at 14-15.

meaningfully respond to defendant's motion for summary judgment of the claim against Dr. Beard.  The Court will therefore grant summary judgment in favor of Dr. Beard on this claim.

Defendants argue that Dr. Sadid's claim against Garner should be dismissed as well because plaintiff cannot make out a prima facie defamation claim and the claim is barred by various affirmative defenses.  The Court is not persuaded by either set of arguments.

Turning first to the attack on the elements, Dr. Sadid correctly identifies the elements of a defamation claim applicable here as follows:  He must prove that (1) Garner communicated information about him to others; (2) the information was defamatory; and (3) he was damaged because of the communication.  *Clark v. The Spokesman-Review*, 163 P.3d 216 *(*Idaho 2007) (citing *Gough v. Tribune-Journal Co.,* 249 P.2d 192, 194 *(*Idaho 1952)) .

Defendants argue that the defamation claim against Garner fails on the second element – that the communication be defamatory – because Garner's statements were either truthful or statements of opinion.

## A.    Truth

Turning first to the "truth" argument, if Garner's statements were indeed truthful, then Dr. Sadid cannot make out a prima facie defamation claim.  *See, e.g., Steele v. Spokesman-Review*, 61 P.3d 606, 610 (Idaho 2002).  Further, "[i]t is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression

are immaterial provided that the defamatory charge is true in substance." *Id.* (citing

Restatement (Second) of Torts § 581A, cmt. f (1977).  Rather, "so long as the substance,

the gist, the sting of the allegedly libelous charge be justified," minor inaccuracies do not

amount to falsity." *Id.* (citations omitted).

Here, Garner says he accurately summarized the reasons the University fired Dr.

Sadid.  As already noted, the article quotes Garner as saying "'[Dr. Sadid] presented a lot

of safety issues.  There were many individuals who filed reports where they claimed

Sadid threatened them." *Nov. 18, 2009 Article,* Dkt. 87 at 22.  The article also contains

the following quotes:

- "Garner also stated that several of these people who had filed reports went
  before administrative committees, detailing the threats." *Id.*

- "'There are some facts we have that if they were made available to the
  public, people might have a completely different view of Dr. Sadid,' Garner
  said." *Id.*

- "'As a good of a professor [as] Dr. Sadid was, there were a lot of concerns
  for people's safety.' Garner said.  'We're stewards for the students and one
  of our biggest obligations, along with making sure they get a great
  education, is that they remain safe.'" *Id.*

The key problem with Garner's statements is that if they are read favorably to the

plaintiff, they imply that Dr. Sadid *directly* threatened people and that these direct threats

are what triggered his termination.  But there is no evidence that Dr. Sadid was fired

based on his direct threats to anyone.  To be sure, there is evidence that his firing was

partly based on the fact that some women *felt threatened* by observing Dr. Sadid's

interactions with others, as well as his demeanor.  For example, as detailed above, one

female staff member said she experienced "severe anxiety and fear of imminent violence" after witnessing Dr. Sadid yelling at Dean Jacobsen during an argument.  *See* Dkt. 88-13, ¶ 1, at 2*;* Dkt. 92, Ex. I at 17.

But it is arguably an untruthful overstatement to say that "many individuals" filed reports claiming Dr. Sadid threatened them, and that *these* threats are what triggered Dr. Sadid's firing.  In other words, saying or implying that someone *directly threatened* other people is different from saying that a person generally feels threatened by another's behavior.  Consequently, the jury will have to determine whether Garner's statements are "substantially accurate."

### B.    Opinion

Defendants also argue that Dr. Sadid's defamation claim fails because Garner was merely expressing his personal opinions – not facts.

Preliminarily, Dr. Sadid argues that defendants waived this defense because "opinion," or "First Amendment" are not listed as affirmative defenses in defendants' answer.  This argument is not persuasive, however, because to be defamatory, a statement must involve false statements of fact.  *See Wiemer v. Rankin*, 790 P.2d 347, 353 (Idaho 1990).  Opinions, on the other hand, are not facts and are protected speech under the First Amendment.  *Id.*  Thus, in attacking the prima facie elements of a defamation claim, defendants should be permitted to argue that the statements are opinions without raising separate affirmative defenses.  As this court has explained, "[a] defense which [merely] demonstrates that plaintiff has not met its burden of proof [as to an element plaintiff is

required to prove] is not an affirmative defense." *Smith v. North Star Charter School, Inc.,* Case No. 1:10-cv-618-WBS, 2011 WL 3505280, at *2 (D. Idaho July 26, 2011) (citing *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) (alterations supplied by *Smith*).).

The Idaho Supreme Court has adopted the Second Circuit's approach to distinguish between factual statements and mere expressions of opinion, noting:

> An assertion that cannot be proved false cannot be held libelous. A writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be. Liability for libel may attach, however, when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader. If an author represents that he has private, first-hand knowledge which substantiates the opinions he expresses, the expression of opinion becomes as damaging as an assertion of fact.

*Weimer*, 790 P.2d at 352 (citing *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977)). As such, "[o]pinions based on false facts are actionable only against a defendant who had knowledge of the falsity or probable falsity of the underlying facts." *Hotchner*, 551 F.2d at 913.

In reviewing Dr. Sadid's defamation claim, this Court must ask, as a threshold matter, "whether a reasonable factfinder could conclude that the statements 'impl[ies] an assertion of objective fact.'" *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990) (citation omitted). If the answer is no, the claim is foreclosed by the First Amendment. *Id.*

Here, the Court easily concludes that a reasonable factfinder could conclude that

all of Garner's contested statements are factual, rather than opinions. First, saying that "many individuals" filed reports indicating that Dr. Sadid threatened them cannot logically be construed as a mere opinion. Also, saying that Dr. Sadid presented "a lot of safety issues" might be an opinion, but in context it could also be viewed as a factual assertion. Accordingly, the Court finds that the First Amendment does not foreclose Dr. Sadid's defamation claim.

### C.    Damages

Defendants also argue that Dr. Sadid's defamation claim fails as a matter of law because he cannot prove the third element of his claim – damages. Dr. Sadid counters that he does not need to prove damages because Garner's comments are per se defamatory.

Idaho follows the common law rule allowing plaintiffs to receive an award of general damages without proof of special damages in defamation per se cases. *See, e.g., Barlow v. Int'l Harvester, Inc*., 522 P.2d 1102, 1117 (Idaho 1974). Statements are per se defamatory if they impute to the plaintiff 1) a criminal offense; 2) a loathsome disease; 3) a matter incompatible with his trade, business, profession, or office; or 4) serious sexual misconduct. *Yoakum v. Hartford Fire Ins. Co,* 923 P.2d 416, 425 (Idaho 1996). If an allegedly defamatory statement does not fall within one of these categories, a plaintiff must allege and prove that some special harm resulted from the utterance. *Id.*

If the alleged statements are "plain and unambiguous," then the Court determines as a matter of law whether the statements constitute libel per se. *See Weeks v. M–P*

*Publ'ns,* 516 P.2d 193, 195 (Idaho 1973). If, on the other hand, the statements use language that is not plain and unambiguous, then whether the statements are per se defamatory is a factual question for the jury. *Id.*

Dr. Sadid contends that Garner accused him of criminal assault by saying that Dr. Sadid "threatened individuals with physical and psychological harm." *See Response,* Dkt. 102, at 23. But Garner did not plainly say that Dr. Sadid made any *specific* threat. He just said that Dr. Sadid "threatened many individuals" and "presented a lot of safety issues."

A mere threat is not a criminal assault, however. Idaho defines criminal assault to include an intentional, unlawful threat – by word or act – to do violence to another person coupled with an apparent ability to do violence, which induces a well-founded fear that violence is imminent. See Idaho Code § 18-901.[5]

Under this definition, the Court cannot conclude, as a matter of law, that Garner accused Dr. Sadid of criminal assault. But the Court also cannot rule out the possibility that someone reading Garner's comments might understand that Garner had indeed

---

[5] In full, Idaho Code § 18–901 reads:

Assault defined. – An assault is:

(a) An unlawful attempt, coupled with apparent ability, to commit a violent injury on the person of another; or

(b) An intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent.

accused Dr. Sadid of criminal assault.  As one court has explained, "[w]ith regard to false accusations of a crime, 'the words need not carry upon their face a direct imputation of crime.'" *Longbehn v. Schoenrock*, 727 N.W.2d 153, 158 (Minn. Ct. App. 2007) (citation omitted).  Instead, "'[i]t is sufficient if the words spoken, in their ordinary acceptance, would naturally and presumably be understood, in the connection and under the circumstances in which they are used, to impute a charge of crime.'" *Id.* at 159 (citation omitted).  In context, and particularly because Garner twice referred to safety concerns raised by Dr. Sadid's conduct, a person reading the article could reasonably understand that Garner was accusing Dr. Sadid of criminal assault.  Ultimately, then, his statements are ambiguous, and the jury will have to decide whether they are defamatory per se.

Defendants do not dispute that a reasonable person might understand that Garner was accusing Dr. Sadid of criminal assault, nor do they analyze Idaho's criminal assault statute to determine whether Garner's statements amount to an assault.  Instead, defendants argue that Dr. Sadid did not plead a per se defamation case.  This argument is threadbare, however; defendants do not cite any supporting authority and the argument itself consists of a single sentence.  *See Reply*, Dkt. 110, at 11 ("While Sadid argues that he need not prove damages because Garner's statements are slanderous per se, he failed to plead that cause of action.").  The Court is not persuaded by this conclusory argument.  The defamatory statement alleged in the complaint will speak for itself.  If the plaintiff has, in fact, alleged that defendant accused him of a crime, he has alleged per se defamation and he will not need to prove special damages.  *Cf. Haynes v. Alfred A.*

*Knopf, Inc*., 8 F.3d 1222, 1226 (7th Cir. 1993) (if defendants allege that plaintiffs made statements which impute that the defendants have committed crimes, then the defendants adequately plead defamation per se).

Finally, Dr. Sadid alleged that he "has suffered in regard to his livelihood, career, and professional reputation." *First Am. Compl*., Dkt. 39, ¶ 95.  As noted, one of the four categories of per se defamation include statements that impute "a matter incompatible with [a person's] trade, business, profession, or office." *Yoakum*, 923 P.2d at 425. Garner commented that Dr. Sadid presented a lot of safety concerns and that the university needed to keep its student safe.  These statements, at the very least, imply that Dr. Sadid does not have the requisite character to teach students.  *See, e.g., Swengler v. ITT Corp*., 993 F.2d 1063 (4th Cir. 1993) (to be defamatory per se under this category, the statement must relate to the "skills or character required to carry out the particular occupation of the plaintiff.") (citation omitted).  Thus, damages could be presumed under this category as well.  Defendants' argument that Dr. Sadid cannot prove damages lacks merit for this additional reason.

### D.    Affirmative Defense:  Immunity Under the Idaho Tort Claims Act

The Court is also not persuaded by Garner's argument that he is immune from suit under Idaho Code § 6-904(3).  This section immunizes government employees from being sued for libel or slander (among other torts) so long as they act within the course and scope of their employment and without malice or criminal intent.  Idaho Code § 6-904(3).  Malice, as used in this statute, is defined as "the intentional commission of a

wrongful or unlawful act, without legal justification or excuse and with ill will, whether or not injury was intended." *Anderson v. City of Pocatello*, 731 P.2d 171, 182-83 (Idaho 1987).[6]  There is a rebuttable presumption that any act or omission by an employee within the time and at the place of his employment is within the course and scope of his employment and without malice or criminal intent.  Idaho Code § 6-903(5); *Anderson v. Spalding*, 50 P.3d 1004, 1013 (Idaho 2002).

Defendants are not entitled to summary judgment based on this defense because factual disputes exist regarding whether Garner acted in the course and scope of his employment.

On the surface, it would seem that Garner – the university's public relations director – would indeed be acting in the course and scope of his employment when he answered questions from a newspaper reporter about Dr. Sadid's termination.  But President Vailas flatly denied that Garner was speaking for the university.  He testified as follows:

> Q:   . . . Now, when Mr. Garner was speaking to the press, whether he was quoted correctly or not, was he speaking on behalf of the University when he was giving that interview?
>
> A.   No.

---

[6] Typically, in the defamation context, "actual malice" refers to a defendant's knowledge of the falsity of the defamatory statements or a reckless disregard concerning their truth, not to any subjective ill will it may have borne the plaintiff. *See Masson v. New Yorker Magazine*, 501 U.S. 496, 510 (1991) ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will."). Nevertheless, the Idaho Supreme Court has generally stated that the term "malice," as used in Idaho Code § 9-403 refers to commission of a wrongful act, without justification, and with *ill will*.  *See Anderson*, 731 P.2d at 182-83.

**MEMORANDUM DECISION AND ORDER - 18**

Q.      He was speaking for himself then?

A.      Whatever he spoke with the -- first of all, you've got to assume that the
        reporter got the facts right.  Second of all, he had an exchange with the
        reporter.  What Mr. Garner has observed on his own or whether – he wasn't
        speaking for the vice president for advancement nor the President.

Q.      He wasn't speaking for you.

A.      No.

Q.      He wasn't speaking for the University.

A       No.

*Vailas Dep.,* Dkt. 102-4, at 77:1-16.

Two competing inferences can be drawn from this testimony.  The first inference,

most favorable to Dr. Sadid, is that Vailas meant Garner was *not* acting in the course and

scope of his employment.  The second inference, more favorable to Garner, is that

President Vailas was not commenting in any detail on Garner's job description, but was

instead stating that he did not think Garner's statements accurately reflected his or the

university's view.  The defendants effectively ask the Court to adopt this second

inference, but the Court cannot do so in ruling on a motion for summary judgment –

especially when President Vailas has not submitted any affidavit further explaining what

he meant.  As it stands, President Vailas' unvarnished deposition testimony is sufficient

to overcome the presumption that Garner was acting in the course and scope of his

employment.  The jury will therefore need to decide this question.

The jury will not need to decide whether Garner acted maliciously, however.  As

noted, Garner enjoys a rebuttable presumption that he did not act maliciously.  Dr. Sadid

has not pointed to anything in the record that would overcome this presumption.

Dr. Sadid attempts to rebut this presumption by pointing to three things:  First, he says that before Garner made his comments, his lawyer sent a letter to defendants instructing them not to tell anyone Dr. Sadid was a safety risk.  Second, he says Garner breached ISU's "established policy" of not commenting on personnel matters.  Third, he says Garner violated Idaho's public records laws – specifically, Idaho Code §§ 9-338 and 9-340C – by disclosing "employee records" to the public.  *See Respons*e, Dkt. 102, at 17-18.  As will be discussed, even assuming Garner deviated from ISU's regular policy and further assuming he violated Idaho statutory law, these facts do not show that he also acted with ill will.  As noted above, to disqualify themselves from immunity, government employees must not only act wrongfully, they must also act with ill will.  *See Anderson*, 731 P.2d at 182-83

Here, there is no direct evidence of Garner's ill will, and the three things Dr. Sadid points to do not circumstantially permit a conclusion that Garner acted maliciously.

As for the letter warning defendants , there is no evidence Garner received it.

Regarding ISU's policy of not commenting on personnel matters, there is no evidence that such a policy was in place at the time Garner made his comments.  To the contrary, Garner testified that there was no such policy in place.  *See Garner Dep.* at 66:14-23.

Finally, Dr. Sadid's argument that Garner violated Idaho's public records act does not fit these facts very well.  By its terms, this act applies to "public records," which are defined as "writings."  *See* Idaho Code § 9-337(13) (defining public records) & (16)

(defining writings to include, nonexclusively, "handwriting, typewriting, printing, photostating, photographing and every means of recording . . . .").  There is no evidence that Garner turned over any of writings to the press.  But more importantly, even assuming that public employees violate public records laws by orally disclosing employee information contained in written records, Dr. Sadid still cannot show that Garner acted maliciously when his comments are viewed in context.  Garner testified that before he commented to the press about Dr. Sadid's termination, he verified that Dr. Sadid had already provided documents about his termination to the press.  Garner's efforts to make sure that the media already had information about Dr. Sadid before commenting strengthens the notion that he did not act maliciously – particularly when he already enjoys a rebuttable presumption that he did not act maliciously.  Under these circumstances, Dr. Sadid has failed to put forth any facts to rebut the presumption Garner enjoys.

In sum, at trial the jury will be called upon to determine whether Garner was acting in the course and scope of his employment.  If they determine that he was, Garner will be immune from suit.

**5.    Defendants' Motion to Amend**

In their reply brief, defendants asserted additional affirmative defenses.  Dr. Sadid objected to defendants' late assertion of the new defenses, which prompted defendants' motion to amend their answer.  Defendants ask to assert five new affirmative defenses: (1) consent; (2) "absolute privilege, including but not limited to quasi-judicial privilege

and that found under I.C. §§ 9-346, as well as qualified and/or common interest privilege" (3) the First Amendment; (4) opinion;[7] and (5) statutory immunity for newspaper publications under Idaho Code §§ 6-702 and 6-713.  *See* Dkt. 117-1.

Because they moved to amend after the established scheduling deadline for amending pleadings, this Court must apply the good-cause standard set forth in Federal Rule of Civil Procedure 16(b).  *See, e.g., Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 607 (9th Cir. 1992).  Unlike Rule 15(a)'s liberal amendment policy, which focuses on the bad faith of the party seeking an amendment and the prejudice to the opposing party, the "good cause" standard set forth in Rule 16 primarily focuses upon the diligence of the party requesting the amendment.  *Id.*  "If that party was not diligent, the inquiry should end." *Id.* at 609 (citations omitted).

Defendants have not established the requisite diligence.  They did not file their motion to amend until roughly ten months after the scheduling-order deadline, three months after the extended discovery cutoff, and two months after the parties filed their summary-judgment motions.[8]  They make no real effort to explain this lengthy delay.

------

[7] For the reasons discussed above, the Court has ruled that defendants are entitled to assert their "opinion" and First Amendment defenses, given that these defenses go directly to the elements of the defamation claim.  The following discussion does not apply to these defenses.

[8] Defendants filed their motion to amend on September 7, 2012.  *See* Dkt. 117.  The deadline for amending pleadings, per the Court's scheduling order, was November 10, 2011.  *See* Dkt. 21.  The parties filed cross-motions for summary judgment on June 29, 2012.  *See* Dkts. 83, 88.The extended fact discovery period closed, after Court-approved extensions, on May 31, 2012.  *See*  Dkts. 77, 78.  The Court also approved the parties' stipulation to conduct additional depositions in June 2012, *see* Dkt. 82, but defendants indicate that the "depositions of Defendants" were concluded on May 30, 2012.  *See Mot. Mem.,* Dkt. 117-2, at 3.

Defendants do point out that the parties did not conduct any depositions until the last 30 days of the discovery period.  But they do not explain why they waited so long to conduct depositions, and, more significantly, they do not say that they unearthed any specific new fact during the depositions that caused them to realize they could raise additional affirmative defenses.  To the contrary, defendants only generally assert that they did not discover the "factual basis" for their new defenses until after the depositions.  *Mot. Mem.,* Dkt. 117-2, at 3.  The Court is not persuaded by such a general argument, particularly when defendants are also arguing that the facts supporting their new affirmative defenses are the same facts they used to support affirmative defenses raised in their original answer – which they filed in January 2012.  *See* Dkt. 48.

Defendants offer two additional reasons for not asking to amend their answer earlier.  Neither establishes diligence or excuses a lack of diligence.

First, defendants say they believed their original answer adequately raised the new affirmative defenses. They point to the following catch-all phrase within their original answer:  "Defendants are immune from liability pursuant to Idaho Code § 6-904 *and/or any other applicable immunity*."  *Answer*, Dkt. 48, at 6 (emphasis added).  This phrase does not, by any stretch, fairly notify plaintiff of the new affirmative defenses defendants now seek to raise.  Construing the answer so liberally would not do justice to the plaintiff. *See* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").  Rather, it would effectively permit defendants to "'lie behind a log' and ambush a plaintiff with an unexpected defense."  *Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir. 1987).

Defendants' reliance on this Court's decision in *Vista Engineering Technologies, LLC v. Premier Technology, Inc.,* Case No. CV09-00008-BLW, 2010 WL 2103960 (D. Idaho May 25, 2010) is unavailing.  Vista did not hold or suggest that a catch-all phrase similar to defendants' sufficiently raised a host of additional, unrelated affirmative defenses.  *Id.* at *3 (defenses not specifically listed answer were sufficiently raised by factual allegations in a counterclaim that invoked the same concerns as the defenses, though in more general terms).  Similarly, defendants' reliance on Idaho law is misplaced.  Although state substantive law governs Dr. Sadid's defamation claim, the "Federal Rules of Civil Procedure determine the manner and time in which defenses may be raised and when waiver occurs." *Taylor v. United States*, 821 F.2d 1428, 1432 (9th Cir. 1987).

Defendants' second reason for not seeking to amend their complaint earlier implicates Federal Rule of Civil Procedure 8(c).  Rule 8(c) requires affirmative defenses to be pleaded in the answer.  *See* Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . .").  The Ninth Circuit has liberalized this rule, however, holding that affirmative defenses can be raised for the first time in summary judgment motions so long as the plaintiff is not prejudiced. *See, e.g., Han v. Mobil Oil Corp.,* 73 F.3d 872 (9th Cir. 1995).

Relying on these Rule 8(c) cases, defendants say it was not necessary to amend their complaint at all.  Rather, they believed they could raise their new defenses in a motion for summary judgment – even after the scheduling-order deadline to amend had

passed.  But the cases defendants rely on do not address how a scheduling order impacts a defendant's ability to raise new affirmative defenses.  Certainly, they do not hold that defendants may disregard scheduling orders in asserting new affirmative defenses.  If that were the case, defendants could ignore court-ordered amendment deadlines.  Instead, they could raise new affirmative defenses in later-filed motions for summary judgment so long as the new defenses would not prejudice the plaintiff.  The upshot is that they could escape Rule 16(b)'s diligence requirement.

The Court cannot accept this argument.  The Rule 8(c) cases teach that defendants do not necessarily waive affirmative defenses by failing to assert them in an answer.  See *id.*  Rather, defenses can be raised in other ways – including in motions for summary judgment.  *Id.*  Accordingly, if a defendant files a motion for summary judgment before the deadline to amend the pleadings has passed, the defendant will not be barred from raising new affirmative defenses so long as plaintiff is not prejudiced.  *Cf. Sweet v. Sec'y, Dep't of Corrs.*, 467 F.3d 1311, 1322 n.4 (11th Cir. 2006) (defendant did not waive affirmative defense by raising for the first time in motion for summary judgment motion, which was filed 36 days after defendant's first pleading and defendant could have amended as a matter of course).

The Ninth Circuit has not expressly grappled with the interplay between Rules 8(c), 15 and 16.  This may be because litigants have not raised Rule 16(b) and the scheduling-order issue presented here, or it may be that the defendants moved for summary judgment before the deadline to amend the pleadings has passed.  *Cf. Magana*

*v. The Northern Mariana Islands*, 107 F.3d 1436, 1446  (9th Cir. 1997) (defendant raised affirmative defense in motion for summary judgment filed three months after answer was filed[9]).  Regardless, the issue is squarely presented here.  The Court concludes that if a defendant seeks to assert new affirmative defenses in a motion for summary judgment after the scheduling-order deadline for amending pleadings has passed, then Rule 16(b)'s good-cause standard applies.  *Accord Sherman v. Winco Fireworks, Inc*., 532 F.3d 709, 715-18 (8th Cir. 2008) (holding that the district court erred by failing to apply good-cause standard in ruling on defendants' motion to amend; discussing the interplay between Federal Rules of Civil Procedure 8, 15, and 16).  For the reasons already discussed, defendants cannot satisfy this standard because they have not established diligence. Their motion to amend will therefore be denied.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED THAT:**

1.     Defendant's Motion for Summary Judgment (Dkt. 83) of Dr. Sadid's state-law claims is **GRANTED** in part and **DENIED** in part.

2.     Plaintiff's Unopposed Motion for Leave to File a Sur Reply (Dkt. 112) is **MOOT.**

---

[9]The *Magana* case does not clarify whether the deadline to amend the pleading had passed, but it is certainly feasible that it had not.  This Court typically sets the deadline to amend the pleadings around three months after the case is at issue.

3.      Defendant's Motion to Amend (Dkt. 117) is **DENIED.**



DATED: May 2, 2013

B. Lynn Winmill
Chief Judge
United States District Court